1  ANDRÉ BIROTTE JR.
   United States Attorney
2  LEON W. WEIDMAN
   Assistant United States Attorney
3  Chief, Civil Division
   IRA A. DAVES
4  Assistant United States Attorney
   California Bar No. 156724
5       Room 7516, Federal Building
        300 North Los Angeles Street
6       Los Angeles, California 90012
        Telephone:  (213) 894-2443
7       Fax: (213) 894-7819
        E-Mail: Ira.Daves@usdoj.gov
8
   Attorneys for Federal Defendant United States of America
9
                UNITED STATES DISTRICT COURT
10
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
11
                     WESTERN DIVISION
12
   JAMES GRANDY,                )    NO. CV 09-1270-JHN(JTLx)
13                              )
        Grandy,                 )
14                              )
        v.                      )    Date: July 12, 2010
15                              )
   UNITED STATES OF AMERICA,    )    Time: 2:00 p.m.
16                              )
                                )
17      Defendant.              )
   _____ )   Hon. Jacqueline H. Nguyen
18                                   United States District Judge
19
20
21
22         DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
23              PARTIAL SUMMARY JUDGMENT
24
25
26
27
28

**TABLE OF CONTENTS**

Page

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . 2

I.   ASSAULT ON GRANDY . . . . . . . . . . . . . . . . . . . 2

II.  SECURITY AT THE HOUSING UNIT ENTRANCES . . . . . . . . . 4

III. SECURITY AT ENTRANCE TO UNIT 6A ON NOVEMBER 25, 2006 . . . 8

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.   THIS ACTION IS JURISDICTIONALLY BARRED BY THE
     DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA. . . . . . 11

     A.   The Discretionary Function Exception . . . . . . . 12

     B.   The United States Exercised Permissible
          Discretion In Its Efforts to Provide For
          Inmate Security. . . . . . . . . . . . . . . . . . 15

          1.   Alleged Failure to Employ Metal Detector . . . 17

          2.   Alleged Failure to Conduct Adequate Search . . 19

          3.   Alleged Failure to Monitor Unit 6A After
               Entry . . . . . . . . . . . . . . . . . . . . 20

II.  TO THE EXTENT THAT GRANDY'S CLAIMS ARE NOT BARRED BY
     THE DISCRETIONARY FUNCTION EXCEPTION, THEY FAIL ON THE
     MERITS. . . . . . . . . . . . . . . . . . . . . . . . . 20

     A.   Defendant Breached No Duty Owed to Grandy. . . . . 20

     B.   Defendant's Acts Or Omissions Did Not Cause
          Grandy's Injuries. . . . . . . . . . . . . . . . . 23

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . 24

i

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Alfrey v. United States,
    276 F.3d 557 (9th Cir. 2002) . . . . . . . . . . .  16, 17

Bell v. Wolfish,
    441 U.S. 520, 99 S. Ct. 1861,
    60 L. Ed. 2d 447 (1979) . . . . . . . . . . . . . .  17

Berkovitz v. United States,
    486 U.S. 531, 108 S. Ct. 1954,
    100 L. Ed. 2d 531 (1988) . . . . . . . . . . .  12, 13, 14

Calderon v. United States,
    123 F.3d 947 (7th Cir. 1997) . . . . . . . . . . .  16, 17

Childers v. United States,
    40 F.3d 973 (9th Cir. 1994)__U.S. __,
    115 S.Ct. 1821, 131 L.Ed 2d . . . . . . . . . . . .  14

Cohen v.  United States,
    151 F.3d 1338 (11th Cir. 1998),526 U.S. 1130 (1999) . .  16

In re Consolidated Atmospheric Testing,
    820 F.2d 982 (9th Cir. 1987),
    485 U.S. 905 (1988) . . . . . . . . . . . . . . .  14

Dalehite v. United States,
    346 U.S. 15, 73 S. Ct. 956, 97 L. Ed. 1427 (1953) .  11, 14

Fang v. U.S.,
    140 F.3d at 1241 . . . . . . . . . . . . . . . .  18, 20

General Dynamics Corp. v. United States,
    139 F.3d 1280 (9th Cir. 1998) . . . . . . . . . . .  14

Kennewick Irrigation District v. United States,
    880 F.2d 1018 (9th Cir. 1989) . . . . . . . . . . .  13

Lesoeur v. United States,
    21 F.3d 965 (9th Cir. 1994) . . . . . . . . . . . .  13

Mitchell v. United States,
    149 F. Supp. 2d 1111 (D. Ariz. 1999) . . . . . . . .  16

Montez v. United States,
    359 F.3d 392 (6th Cir. 2004) . . . . . . . . . . .  16

<u>Ramirez v. United States</u>,
    567 F.2d 854 (9th Cir. 1977)  . . . . . . . . . . . . .   12

<u>United States v. Gaubert</u>,
    499 U.S. 315, 111 S. Ct. 1267,
    113 L. Ed. 2d 335 (1991)  . . . . . .  2, 12, 13, 14, 15, 18

<u>United States v. Kubrick</u>,
    444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 259 (1979)  . .   11

<u>United States v. Mitchell</u>,
    445 U.S. 535, 100 S. Ct. 1349, 63 L. Ed. 607 (1980) . .   11

<u>United States v. Neustadt</u>,
    366 U.S. 696, 81 S. Ct. 1394, 6 L. Ed. 614 (1961) . . .   11

<u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense
(Varig Airlines)</u>,
    467 U.S. 797, 1046 S. Ct. 2755, 91 L. Ed. 2d 660  .   12, 14

<u>United States v. Sherwood</u>,
    312 U.S. 584, 61 S. Ct. 767 (1954) . . . . . . . . . .   11

<u>Valdez v. United States</u>,
    56 F.3d 1177 (9th Cir. 1995)  . . . . . . . . . . . .   14

<u>Weissich v. United States</u>,
    4 F.3d 810 (5th Cir. 1993)  . . . . . . . . . .   13, 18, 20

**STATE CASES**

<u>Schrimsher v. Bryson</u>,
    58 Cal. App. 3d 660, 130 Cal. Rptr. 125 (1976)  . . . .   23

<u>State v. Superior Court of Sacramento County</u>,
    150 Cal. App. 3d 848, 197 Cal. Rptr. 914 (1984) . . . .   23

<u>Werkman v. Howard Zink Corp.</u>,
    97 Cal. App. 2d 418, 218 P.2d 43 (1950) . . . . . . . .   23

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 4042  . . . . . . . . . . . . . . . . . . .   16

28 U.S.C. § 1346(b) . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . 2, 11, 12, 13

28 C.F.R. § 552.10  . . . . . . . . . . . . . . . .   5, 19

Fed.R.Evid. 602 & 701 . . . . . . . . . . . . . . . . .   22

iii

**INTRODUCTION**

This negligence action against Defendant United States ("Defendant") is brought by Plaintiff James Grandy ("Grandy"), a federal prisoner at the United States Penitentiary in Victorville, California.  Grandy alleges that negligence on the part of a prison official resulted in his being assaulted by an out-of-bounds inmate, in violation of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b) et seq.  Specifically, Grandy alleges that his assailant, Chevon Wiggins ("Wiggins"), was able to stab him because the unit officer on duty, Ray Raygoza ("Officer Raygoza"), was negligent in operating a metal detector at the entrance to his housing unit. (Complaint at ¶8; Grandy's Depo. 11:5-13, pertinent pages of which are attached to the Declaration of Ira A. Daves, filed in support of Defendant's Summary Judgment Motion; Pls. Motion at 2)  Grandy contends that proper operation of the metal detector would have revealed Wiggins to be a non-resident and, further, would have uncovered the weapons Wiggins used in the assault. (Id.)  Grandy also claims that Defendant negligently failed to monitor who was inside the unit after Wiggins had gained entry. (Pls. Motion at 6)[1]

Because Grandy's claims, as set forth in his Motion for Partial Summary Judgment, arise out of alleged negligence in the performance of discretionary acts or omissions, this Court lacks subject matter jurisdiction, pursuant to the discretionary

_____

[1] Grandy's Complaint also alleges negligence in the control of kitchen tools.  He has apparently abandoned that claim.

function exception to the FTCA, 28 U.S.C. §2680(a).[2]

Alternatively, to the extent that Grandy's claims are not barred

by the discretionary function exception, Grandy fails to present

admissible evidence sufficient to raise genuine issues of

material fact or to establish liability as a matter of law on any

of his claims.  Consequently, Grandy's Motion should be denied,

and judgment should be entered in favor of Defendant, as a matter

of law.[3]

## STATEMENT OF FACTS[4]

I.   ASSAULT ON GRANDY

At approximately 12:45 p.m. on November 25, 2006, Grandy was

assaulted by Wiggins. (Grant Dec. ¶ 2, referring to paragraph 2

---

[2]   In United States v. Gaubert, 499 U.S. 315, 111 S.Ct.
1267, 113 L.Ed.2d 335 (1991), the Supreme Court explained that
the purpose of the discretionary function exception is to
"prevent judicial second-guessing of legislative and
administrative decisions grounded in social, economic, and
political policy through the medium of an action in tort." _Id._
at 323.

[3]   Defendant has filed its own motion for summary judgment,
also presently set for hearing on July 12, 2010.  Defendant
predicated its motion primarily on Grandy's failure to raise a
genuine issue of material fact.  However, inasmuch as 28 U.S.C.
§2680(a) bars Grandy's Complaint, it both suffices to defeat
Grandy's Motion For Partial Summary Judgment and constitutes an
additional ground for rendering judgment in favor of the United
States.

[4]   For the convenience of the Court, Defendant restates
herein the Statement of Facts set forth in its own Motion For
Summary Judgment or, in the Alternative, Partial Summary
Judgment.  The Declarations of Ira A. Daves and Shawn Grant,
filed in support of Defendant's Motion, will not be re-filed.
However, evidence contained therein will be reference in this
Opposition.

2

of the Declaration of Shawn Grant, filed concurrently herewith.)
Wiggins resided in a different housing unit in the Penitentiary.
(*Id.*) After gaining entry into Grandy's housing unit ("Unit
6A"), Wiggins stabbed Grandy multiple times in his upper torso.
(*Id.*) In the aftermath of the incident, prison officials
recovered two metal weapons, one of which appeared to be a
sharpened butter knife. (*Id.* ¶ 5) Wiggins was not assigned to
Unit 6A, a general housing unit in which Grandy resided; he had
no prior official authorization to enter the unit and was found
"out-of-bounds" when he assaulted Grandy. (*Id.*)

The evidence is undisputed that the attack was a random act
of violence, related to gang activity at the Penitentiary.[5] At
his deposition, Grandy denied knowing Wiggins prior to the
assault; and there is no evidence that Wiggins knew Grandy before
assaulting him. (*Id.* ¶ 6; Grandy Depo. 38:16-18) There is no
evidence in the record that prison staff knew that Grandy was at
risk of attack by Wiggins or any other inmate. (Grant Dec. ¶ 6;
Raygoza Depo. 44:20-45:1; Grandy Depo. 42:6-17) In fact, there

---

[5] One month prior to the November 2006 assault on him,
Grandy was himself disciplined for possession of a homemade
weapon. (Grant Dec. ¶ 7) Approximately two years after the
attack on him, Grandy and three other inmates entered the cell of
another inmate and assaulted him by stabbing him in the head.
(*Id.*) The victim resided in a different housing unit, and Grandy
and his fellow assailants traveled out-of-bounds in order to pull
off the attack. (*Id.*) Several months later, Grandy was written
up again for possession of a weapon. (*Id.*) Finally, on February
19, 2009, a staff member found Grandy scratching the word "CRIP"
into a computer station in the Electronic Law Library. (*Id.*)
Grandy admitted to the charge during a Unit Discipline Committee
hearing on February 21, 2009. (*Id.*)

1  is no evidence that Grandy had been threatened before the attack

2  or had reason to believe that he was in any kind of danger.

3  (Grandy Depo. 40:4-6)

4  II.   SECURITY AT THE HOUSING UNIT ENTRANCES

5       The Penitentiary in Victorville was a high security

6  facility, housing the most violent level of inmate.  (*Id.* ¶ 8)

7  Limitations on resources played heavily into the Penitentiary's

8  ability to monitor the inmate population in various areas,

9  including the entrances to the inmate housing units.  (*Id.*)

10 Prison staff focused resources on locations where inmates worked,

11 resided, and received medical attention.  (*Id.*)

12      The process of providing internal security, including

13 decisions about the appropriate level and frequency of inmate

14 monitoring during open movements, took into account movement

15 needed to achieve inmate rehabilitative goals and to safeguard

16 constitutional rights.  (*Id.* ¶ 9)  Freedom of movement within the

17 general prison population was one aspect of the rehabilitative

18 effort.  (*Id.*)  Prison officials determined that socialization

19 objectives could only be met by allowing inmates, other than a

20 small minority of the federal inmate population, the opportunity

21 to move relatively freely throughout their housing units and

22 other areas of the prison during normal daytime hours.  (*Id.*)

23      Inmates and staff at the Penitentiary in Victorville entered

24 general housing units, such as Unit 6A, through a "sally port"

25 area that was monitored by one unit officer and two video

26 cameras.  ((*Id.* ¶ 10; Grant Depo. 13:1-7)  The sally port

4

1  consisted of:  (1) an outside door or slider that was operated by
2  the control center, (2) a small room containing a metal detector,
3  and (3) an inner door.  (Grant Dec. ¶ 10)

4     Pursuant to BOP policy and practice, inmates entering the
5  unit through the sally port area passed through the metal
6  detector, which was manned by the unit officer on duty.  (Grant
7  Dec. ¶ 11; Grant Depo. 13:13-14:2)  Resident inmates were
8  permitted to traverse the sally port area, through the metal
9  detector, during routinely scheduled, controlled "open
10 movements."  (Grant Dec. ¶ 11)  During an open movement, which
11 typically lasted for approximately ten (10) minutes, inmates were
12 allowed to access other departments within the Penitentiary, such
13 as the Commissary, Recreation Yard, and Dining Hall.  (*Id.*)  The
14 unit officer was posted at the unit entrance during open
15 movements.  (*Id.*)  As much as reasonably possible, it was the
16 responsibility of the unit officer to ensure that all inmates
17 entering the unit passed through the metal detector.  ((*Id.;*
18 Grant Depo. 25:13-15)

19    Absent a metal detector alert, BOP policy and practice gave
20 officers manning the housing unit entrances wide discretion as to
21 when and how to search inmates for weapons.  (Grant Dec. ¶ 12)
22 Specifically, Title 28 C.F.R. § 552.10 authorized the BOP to
23 conduct "searches of inmates and of inmate housing and work
24 areas" and, moreover, directed staff to "employ the least
25 intrusive method of search practicable, as indicated by the type
26 of contraband and the method of suspected introduction."  (*Id.* ¶

5

27
28

12; Request for Judicial Notice)  The regulation did not mandate that prison officials conduct housing entrance searches in a particular manner.  (*Id.*)  To the contrary, the regulation explicitly conferred discretion on prison staff to decide how to search inmates in view of the particular threat presented and the practicalities of the situation.  (*Id.*)

Furthermore, the judgment of unit officers about when and how extensively to search inmates and their cells was informed by their professional training and experience.  (Grant Dec. ¶ 13) That judgment involved a balancing of all the potential risks that inevitably arise in a prison setting -- where antisocial persons co-exist and sometimes engage in violent, explosive conduct that is often difficult to predict -- against the inmates' interest in being free from overly intrusive searches. (*Id.*)  Although unit officers conducted routine pat searches of inmates in order to deter the flow of contraband, for example, they had discretion in determining whom to pat down and under what circumstances.  (*Id.*)

It was against policy and practice for non-resident inmates to enter other housing units without the express permission or authorization of prison officials.  (*Id.* ¶ 14; Allison Depo. 28; Grant Depo. 12:16-21)  Unit officers routinely prevented inmates from entering housing units to which they were not assigned. (Grant Dec. ¶ 15)  Nevertheless, transgressions did occur, from time to time.  (*Id.*)  Identifying and preventing non-resident inmates from entering other housing units was a difficult job,

6

for several reasons. (*Id.* ¶ 16) First, there were over one hundred fifteen inmates assigned to each unit, and the unit officer was responsible for many other duties, such as searching cells, conducting rounds, and performing counts. (*Id.*) Second, unit officers were often unfamiliar with inmates residing in units they were charged with watching because the officers were frequently rotated among units, especially if they were substituting for absent employees. (*Id.*) Third, inmates often wore clothing, such as coats and caps, that sometimes obscured their faces and bodies. (*Id.*) Finally, depending upon the day, large numbers of inmates entered and left the unit in rapid succession, which could further complicate the process of inmate identification. (*Id.*)

Given the difficulties inherent in tracking inmates during open movements, randomly scheduled census counts were conducted after open movements ended and the unit doors were secured so as to double-check the location of inmates and determine if any were out-of-bounds. (*Id.* ¶ 17) Transgressions were taken seriously, and inmates caught out-of-bounds were subject to discipline. (*Id.* ¶ 18) Typically, an inmate caught out-of-bounds would be issued an incident report. (*Id.*) Although possible, actual inmate-on-inmate violence attributable to inmates being out-of-bounds was a rare occurrence at the Penitentiary. (*Id.* ¶ 19)

As much as reasonably possible, given the number of inmates entering and leaving the unit at any particular time as well as unanticipated distractions, it was the responsibility of the unit

7

officer manning the entrance to identify and deny access to any
non-resident inmates attempting to enter the unit without
permission.  (Grant Dec. ¶ 20; Grant Depo. 12:16-21; 14:3-20;
31:16-21)  It was also the responsibility of the unit officer to
ensure that the entrance to the unit was locked at the conclusion
of the open movement and, subsequent to movement, conduct a
census check to ensure that only residents or authorized non-
resident inmates were present in the unit.  (Grant Dec. ¶ 20;
Grant Depo. 15:6-15)  However, there was no requirement that the
unit officer, or any staff member, maintain constant eye contact
on every inmate during open movements.  (Grant Dec. ¶ 20)

III. <u>SECURITY AT ENTRANCE TO UNIT 6A ON NOVEMBER 25, 2006</u>

     The unit officer on duty at Unit 6A at the time of the
assault was Raygoza.  (*Id.* ¶ 22; Raygoza Depo. 43:10-12)  Officer
Raygoza assumed his duties on November 25, 2006 at 8:00 a.m., and
he manned his station during the 9:00 a.m. and Noon open
movements that preceded the assault on Grandy.  (*Id.*)  Officer
Raygoza conducted a census check beginning at 10:00 a.m. on the
date of the incident.  (*Id.* ¶ 27)  Unit 6A went on "lockdown"
following the assault on Grandy at 12:44 p.m.  (*Id.*)

     It is undisputed that Wiggins did not have prior official
authorization to enter Unit 6A and was found to have been out-of-
bounds when he assaulted Grandy.  (*Id.* ¶ 23)  It is further
undisputed that Wiggins entered Unit 6A on Officer Raygoza's
watch.  (Raygoza Depo. 67:1-3)  There are no first-hand accounts
regarding the particulars of Wiggins entry:  there is no

8

1  testimony as to whether Officer Raygoza stopped and questioned

2  Wiggins prior to permitting him into the unit, and there is no

3  testimony as to whether Wiggins presented to Officer Raygoza some

4  form of written or verbal request or prior authorization to

5  enter.

6      Officer Raygoza testified that inmates entering Unit 6A were

7  required to pass through the metal detector, which he operated on

8  the day in question, and there is no evidence that Officer

9  Raygoza permitted Wiggins to enter Unit 6A without requiring him

10 to pass through the metal detector.  (*Id.* ¶ 23; Raygoza Depo.

11 113:9-15; 126:21-127:2)   There is no evidence that Officer

12 Raygoza had prior knowledge of the gang tensions that led to

13 Wiggins' attack on Grandy.  (*Id.* ¶ 25)

14     All that is known is that Officer Raygoza permitted Wiggins

15 entry, perhaps assuming in error that he was a resident or

16 otherwise had official authorization or some legitimate reason to

17 enter.  (*Id.* ¶ 25)[6]  As for the presence of the weapons used by

18 Wiggins in the attack on Grandy, it is undisputed that, when non-

19 resident Wiggins entered Unit 6A, the metal detector did not

20 alert. (Grant Dec. ¶ 26)  The metal detector was in place at the

21

22     [6]  Officer Raygoza testified that, consistent with the
   policy prohibiting non-resident inmates from entering other
23 housing units without authorization, inmates were not required to
   go to a "specific place" during an open move but could travel
24 anywhere they wanted.  (Raygoza Depo. 40:20-42:6)  He further
   corroborated that inmates were "not supposed to" enter housing
25 units in which they did not reside.  (Raygoza Depo. 41:18-42:6)
   There is no evidence that non-resident inmates regularly or even
26 occasionally entered Unit 6A under Officer Raygoza's watch
   *without* his knowledge or permission, without some other official
27 authorization, or without going through the metal detector.  (*Id.*
   69:6-9; Grant Dec. ¶ 24; Raygoza Depo. 113:9-15; 126:21-127:2)
28

1  time and there is no evidence that the metal detector

2  malfunctioned that afternoon. (*Id.*; Raygoza Depo. 55:15-17)  It

3  is undisputed that the metal weapons recovered after the attack

4  would have triggered the metal detector, assuming that it was

5  properly functioning that afternoon. (Grant Dec. ¶ 26)  And no

6  witness reported seeing Wiggins enter the unit with weapons on

7  his person. (*Id.*)  Officer Raygoza testified that the weapon

8  used to attack Grandy "could have easily been inside the housing

9  unit already when inmate Wiggins went into the unit." (Raygoza

10  Depo. 54:10-14)

11      Another inmate, Woodie Ashfield ("Ashfield"), suggested at

12  his deposition that, on the day in question, Officer Raygoza

13  permitted certain inmates to walk around the metal detector.  He

14  testified that, during the Noon open movement, he observed

15  Officer Raygoza monitoring the movement of the inmates as they

16  entered the unit. (Ashfield Depo. 5:18-21; 15:9-13)  Ashfield

17  provided an eye-witness account in which he recalled seeing

18  Officer Raygoza positioned at the door just outside the building

19  "watching everybody that comes in the unit." (Ashfield Depo.

20  17:12-18:6)  He further recalled that he and Officer Raygoza

21  "locked eyes." (*Id.*)  Ashfield testified that, when he entered

22  the unit, he himself did *not* pass through the metal detector,

23  that he "always" walked past it, and that "[n]obody really goes

24  through it if they don't have to." (*Id.* 20:14-20; 21:6-13)

25  Finally, Ashfield added that he observed non-resident Wiggins

26  walk past Officer Raygoza as he entered the unit. (Ashfield

27  Depo. 12:11-13:4; 13:20-14:4)

28      Tellingly, Ashfield, a resident of Unit 6A, did not testify

10

1  that he saw Wiggins, a non-resident, go around the metal

2  detector, much less that he did so while Officer Raygoza was

3  watching.   Moreover, this inmate admitted that, as a matter of

4  practice, Officer Raygoza was vigilant to metal detector alerts

5  and would routinely instruct inmates to go through the metal

6  detector again if it alerted.  (*Id.* 16:15-17:5)

7      Grandy did not depose Wiggins about how he was able to

8  obtain entry into Unit 6A.

9                          **ARGUMENT**

10  I.   THIS ACTION IS JURISDICTIONALLY BARRED BY THE DISCRETIONARY

11       FUNCTION EXCEPTION TO THE FTCA.

12      The FTCA confers exclusive jurisdiction upon district courts

13  of civil actions or claims against the United States, for money

14  damages and, as such, constitutes a limited waiver of the United

15  States' sovereign immunity.  United States v. Kubrick, 444 U.S.

16  111, 117-18, 100 S.Ct. 352, 62 L.Ed. 259 (1979); Dalehite v.

17  United States, 346 U.S. 15, 18, 73 S.Ct. 956, 97 L.Ed. 1427

18  (1953).  The waiver is subject to a number of express exceptions,

19  which are enumerated in 28 U.S.C. § 2680.   Included among these

20  is the discretionary function exception, 28 U.S.C. § 2680(a).  As

21  conditions of the waiver of sovereign immunity, these exceptions

22  define the court's jurisdiction to entertain the suit.  United

23  States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed. 607

24  (1980) (subsequent history omitted); United States v. Sherwood,

25  312 U.S. 584, 586, 61 S.Ct. 767 (1954), and must be complied with

26  strictly.  Kubrick, 444 U.S. at 117-18, 100 S Ct. 352, 62 L.Ed.

27  259.  The applicability of these exceptions is to be determined

28  in accordance with federal law.  United States v. Neustadt, 366

1  U.S. 696, 705-706, 81 S.Ct. 1394, 6 L.Ed 614 (1961); <u>Ramirez v.</u>

2  <u>United States</u>, 567 F.2d 854, 856 (9th Cir. 1977).

3       A.    <u>The Discretionary Function Exception</u>

4       The discretionary function exception of the FTCA precludes

5  the imposition of liability for conduct "based upon the exercise

6  or performance or the failure to exercise or perform a

7  discretionary function or duty on the part of a federal agency or

8  an employee of the Government, whether or not the discretion

9  involved be abused."  28 U.S.C. § 2680(a).  Application of this

10 exception is determined by a two-part test.  <u>Gaubert</u>, 499 U.S. at

11 323-24, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335; <u>Berkovitz v.</u>

12 <u>United States</u>, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100

13 L.Ed.2d 531 (1988).

14      First, the conduct at issue must be discretionary in that it

15 must "involve[] an element of judgment or choice."  <u>Berkovitz</u>,

16 486 U.S. at 536, 108 S.Ct. at 1958, 113 L.Ed.2d 335.  This

17 inquiry is the same regardless of the status of the actor.

18 <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense</u>

19 <u>(Variq Airlines)</u>, 467 U.S. 797, 813 (1984), 1046 S.Ct 2755, 91

20 L.Ed.2d 660; <u>Berkovitz</u>, 486 U.S. at 536, 108 S.Ct. at 1958, 113

21 L.Ed.2d 335.  The discretionary function exception protects the

22 conduct of federal employees at all levels of government.

23 <u>Gaubert</u>, 499 U.S. at 323-24, 111 S.Ct. at 1275, 113 L.Ed.2d 335.

24 Judgment or choice is absent "when a federal statute, regulation,

25 or policy specifically prescribes a course of action for an

26 employee to follow" because  then "the employee has no rightful

27 option but to adhere to the directive."  <u>Berkovitz</u>, 486 U.S. at

28 536, 108 S.Ct. at 1958-59, 100 L.Ed.2d 53.  Where judgment or

1   choice is available, there is nothing that limits its permissible

2   exercise to "policymaking or planning functions." <u>Gaubert</u>, 111

3   S.Ct. at 1275, 111 S.Ct. 1267, 113 L.Ed.2d 335.

4        Second, "assuming that the challenged conduct involves an

5   element of judgment, a court must determine whether that judgment

6   is of the kind that the discretionary function exception was

7   designed to shield." <u>Berkovitz</u>, 486 U.S. at 536, 108 S.Ct. at

8   1958-59, 100 L.Ed.2d 531.  The exception protects those

9   discretionary actions or decisions which are based on

10  considerations ... "grounded in social, economic and political

11  policy." *Id.* at 537, 108 S.Ct. at 1958-59, 100 L.Ed.2d 531.

12  Conscious consideration of policy factors by the government agent

13  is not necessary.  *See* <u>Gaubert</u>, 499 U.S. at 325-26, 111 S.Ct. at

14  1275, 100 L.Ed.2d 531.  Rather, the question is "the nature of

15  the actions taken and whether they are susceptible to policy

16  analysis." *Id.*  "When a statute, regulation or agency

17  guidelines allows a government agent to exercise discretion, it

18  must be presumed that the agent's acts are grounded in policy

19  when exercising that discretion." <u>Weissich v. United States</u>, 4

20  F.3d 810, 814 (9th Cir. 1993), *cert. denied*, 512 U.S. 1219

21  (1994).

22       It follows that §2680(a), which applies both to the exercise

23  of discretion and the failure to exercise discretion, is

24  applicable even when a federal employee fails to consider or

25  balance important policy concerns in reaching a decision.  *See*

26  <u>Lesoeur v. United States</u>, 21 F.3d 965 (9th Cir. 1994); *see also*

27  <u>Kennewick Irrigation Dist. v. United States</u>, 880 F.2d 1018 (9th

28

1  Cir. 1989) (holding that, where decisions are grounded in social,

2  economic or political policy judgments, the discretionary

3  function exception is presumed to apply whether or not the

4  government considered these factors and made a conscious decision

5  thereupon); In re Consolidated Atmospheric Testing, 820 F.2d 982

6  (9th Cir. 1987), cert. denied, 485 U.S. 905 (1988) (same); Valdez

7  v. United States, 56 F.3d 1177 (9th Cir. 1995) (same); Childers

8  v. United States, 40 F.3d 973 (9th Cir. 1994), cert. denied, __

9  U.S. __, 115 S.Ct. 1821, 131 L.Ed 2d. 744 (1995) (same).

10     In enacting the discretionary function exception, "Congress

11  wished to prevent judicial 'second guessing' of legislative and

12  administrative decisions grounded in social, economic, and

13  political policy through the medium of an action in tort." Variq

14  Airlines, 467 U.S. at 814, 1046 S.Ct. 2755, 91 L.Ed.2d 660;

15  Berkovitz, 486 U.S. at 537, 108 S.Ct. 1954, 100 L.Ed.2d 335;

16  Gaubert, 499 U.S. 315, 111 S.Ct. at 1273, 113 L.Ed.2d 335.   If

17  the conduct satisfies both tests, then the discretionary function

18  exception bars tort claims based on that conduct, including

19  negligence claims.  See Dalehite, 346 U.S. at 34, 73 S.Ct. 956,

20  97 L.Ed. 1427.[7]

21     B.   The United States Exercised Permissible Discretion

22

23     [7] Factual issues concerning negligence are irrelevant to
   the threshold jurisdictional issue of whether an agency's actions

24  are shielded from liability by the discretionary function
   exception, and the exception applies even when the discretionary

25  acts themselves constitute negligence.  Moreover, it is of no
   consequence that certain aspects of the agency's conduct may not

26  be discretionary if the conduct ultimately and necessarily
   challenged by the suit is discretionary.  General Dynamics Corp.

27  v. United States, 139 F.3d 1280 (9th Cir. 1998).

28
                              14

<u>In Its Efforts to Provide For Inmate Security.</u>

Where a plaintiff contends that federal employees violated mandatory directives, it is the plaintiff's burden to identify with specificity what mandatory statutes, regulations or directives have allegedly been violated. *See* <u>Gaubert</u>, 499 U.S. at 329-330, 111 S.Ct. 1267, 113 L.Ed.2d 335.  Grandy failed to do so in his Complaint.  The essence of Grandy's negligence claim is set forth in his Motion and is as follows:  the BOP failed to exercise due care in preventing the unauthorized entry of his assailant into his housing unit which resulted in his being stabbed by a secreted knife.  (Pl. Mot. at 2, 5; Complaint at ¶ 8)  More specifically, Grandy asserts claims based on the alleged negligence of Officer Raygoza in exercising discretion in monitoring Grandy's housing unit, both prior and subsequent to Wiggins' entry.[8]  At most, such claims -- which, in any event, are not supported by the evidence Grandy attaches[6] -- allege

_____

[8]  Because Grandy's Motion provides more clarity regarding his allegations of negligence, Defendant is able to raise the discretionary function exception's bar to this action for the first time in response to Grandy's Motion.

[6]  Grandy's Motion does not cite to the evidence attached in support of the claims advanced therein.  Nor are Grandy's purported uncontroverted facts supported by the evidence in that many of the conclusions drawn or statements attributed are simply not set forth in the cited Exhibits.  For example, Grandy alleges that at Exhibit C, pp. 40-43, Officer Raygoza stated that inmates could move from other housing units to unit 6A as long as they were searched and that this statement misconstrues BOP policy.  First, Officer Raygoza stated that inmates were not permitted such free movement and had to be subjected to a search.  <u>See</u> p. 42 of Raygoza Deposition, omitted by Grandy, and attached to the Daves Declaration.  Second, Officer Raygoza's statement is, in fact, consistent with BOP policy as set forth by Grandy as

15

1  nothing more than negligence in the exercise of allowable

2  discretion.  As such, they are barred by the discretionary

3  function exception and should be dismissed for lack of subject

4  matter jurisdiction.  *See* <u>Alfrey v. United States</u>, 276 F.3d 557,

5  563-67 (9th Cir. 2002); *see also* <u>Hernandez v. United States</u>, 83

6  Fed.Appx. 206 (9th Cir. 2003) (holding that the discretionary

7  function exception barred claim based on alleged negligent

8  failure to separate inmate from assailant, warn him of danger,

9  and check for weapons).[7]

10     Pursuant to 18 U.S.C. § 4042, the BOP shall provide for the

11  safekeeping, care, and protection of inmates in its custody.  18

12  U.S.C. § 4042(a)(2) & (3).  However, the statute does <u>not</u> direct

13  the manner by which the BOP must fulfill this duty.  *See* <u>Cohen v.</u>

14

15  Exhibit F, p. 23: inmates <u>should</u> be subject to random pat

16  searches and where, as here, a metal detector is used the unit
   officer <u>should</u> ensure that inmates pass through it.  The excerpt

17  of Officer Raygoza set forth by Grandy at Exhibit C makes clear
   that Officer Raygoza understood the policy but commented that, at

18  times, inmates avoided being searched.  Such a statement is
   nothing more than an acknowledgement of negligence in the

19  performance of a discretionary act.

20     [7]  Citing the discretionary function exception, courts

21  throughout the circuits have routinely dismissed cases premised
   on the allegedly negligent supervision of inmates.  <u>*See*</u>, *e.g.*,

22  <u>Cohen</u>, 151 F.3d at 1344 (dismissing claim by inmate who was
   assaulted by an inmate with an allegedly improper

23  classification); <u>Montez v. United States</u>, 359 F.3d 392, 398-99
   (6th Cir. 2004) (dismissing claim based on alleged failure to

24  keep inmate, who was murdered by another inmate, in protective
   custody); <u>Calderon v. United States</u>, 123 F.3d 947, 949 (7th Cir.

25  1997) (dismissing claim based on manner in which prison officials
   respond to threats by inmate toward fellow inmate protected);

26  <u>Mitchell v. United States</u>, 149 F.Supp.2d 1111 (D. Ariz. 1999)
   (dismissing claim of negligence in preventing inmates from

27  obtaining weapons).

28
                                  16

1  <u>United States</u>, 151 F.3d 1338, 1343-45 (11th Cir. 1998), *cert.*

2  *denied*, 526 U.S. 1130 (1999); <u>Calderon v. United States</u>, 123

3  F.3d 947, 950 (7th Cir. 1997).   Indeed, in the context of

4  prisoner suits, the Supreme Court has long held that prison

5  administrators should be afforded wide-ranging deference in

6  implementing and executing policies because discretion is needed

7  in order to preserve internal discipline and maintain

8  institutional safety.   *See* <u>Bell v. Wolfish</u>, 441 U.S. 520, 547-48,

9  99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).   Consistent with such well-

10  established precedent, the Ninth Circuit has stated that the acts

11  of performing inmate searches and of providing inmate security

12  are unique to the context of prisons; they are "core prison

13  functions for which there are no private-sector analogues."

14  <u>Alfrey</u>, 276 F.3d at 566.

15          1.   <u>Alleged Failure to Employ Metal Detector</u>

16          Grandy's principal claim is that Officer Raygoza was

17  negligent in the performance of his duties as they related to use

18  of the metal detector at the entrance to Unit 6A.   To support

19  this claim, Grandy cites to Post Orders governing General Housing

20  Units, which state, in pertinent part:   "Inmates will be

21  subjected to pat searches and/or metal detector when entering and

22  exiting the unit."   (Exhibit F, page 11 of 24, attached to

23  Boskovich Dec., filed in support of Grandy's Motion).[8]

24          The Post Order language cited by Grandy is permissive, not

25  mandatory.   It provides unit officers discretion to decide the

26  _____

27          [8]  Defendant does not dispute the application of these Post
    Orders to the general housing units.

28

                                    17

manner and scope of searches at their housing unit entrances.  It

does not state that every entering or exiting inmate must pass

through a metal detector.  To the contrary, it gives the unit

officers the discretion to conduct searches by either using pat

downs or the metal detector.[9]  Inmates can expect to be subjected

to either form of search when entering or exiting their units.[10]

Because the challenged conduct "involv[es] an element of judgment

or choice" and does not "prescribe[] a course of action for an

employee to follow," the first prong of the discretionary

function analysis is satisfied.  *See* Fang, 140 F.3d at 1241.

     The second prong of the analysis is also met here.  First,

the discretion afforded unit officers tasked with monitoring

inmate movement at the entrance creates a presumption that the

discretion was based in public policy.  *See* Gaubert, 499 U.S. at

324, 111 S.Ct. 1267, 113 L.Ed.2d 335.  More importantly, Captain

Grant's testimony establishes, as an indisputable factual matter,

that the Post Orders giving the officer discretion were squarely

_____

[9]   An accompanying provision of the Post Orders cited by
Grandy bestows even broader discretion regarding searching
inmates during movements:  "The Unit Officer should monitor
incoming and outgoing traffic, randomly conducting pat searches
and if a metal detector is present, ensure each inmate is
clearing it."  (Exhibit F, page 23 of 24, attached to Boskovich
Dec., filed in support of Grandy's Motion)

[10]   In his Declaration supporting Defendant's Motion for
Summary Judgment, Shawn Grant, the Captain in charge of Unit 6A
at the time of the incident, provided his understanding of BOP
metal detector policy in 2006.  He stated that, pursuant to BOP
policy and practice, inmates were required to pass the metal
detector.  The practice of requiring inmates to pass the metal
detector was consistent with the policy giving officers the
discretion to use either pat searches or metal detectors.

18

"grounded in policy." <u>Weissich</u>, 4 F.3d at 814.  The process of
providing internal security, including decisions about the
appropriate level and frequency of inmate monitoring during open
movements, took into account movement needed to achieve inmate
rehabilitative goals and to safeguard constitutional rights.
(Grant Dec. ¶9.)  Freedom of movement within the general prison
population was one aspect of the rehabilitative effort.  (*Id*.)
Prison officials determined that socialization objectives could
only be met by allowing inmates, other than a small minority of
the federal inmate population, the opportunity to move relatively
freely throughout their housing units and other areas of the
prison during normal daytime hours.  (*Id*.)

       2.   <u>Alleged Failure to Conduct Adequate Search</u>

Grandy next claims that, apart from the alleged failure to
employ the metal detector, Officer Raygoza "failed to search Mr.
Wiggins when he entered housing unit 6A." (Grandy's Motion at
6.)  Title 28 C.F.R. § 552.10 authorized the BOP to conduct
"searches of inmates and of inmate housing and work areas" and,
moreover, directed staff to "employ the least intrusive method of
search practicable, as indicated by the type of contraband and
the method of suspected introduction." (Grant Dec. ¶12; Request
for Judicial Notice)  This regulation did not mandate that prison
officials conduct housing entrance searches in a particular
manner.  (*Id*.) To the contrary, the regulation explicitly
conferred discretion on prison staff to decide how to search
inmates in view of the particular threat presented and the
practicalities of the situation.  (*Id*.)  Because the challenged

19

conduct "involv[es] an element of judgment or choice" and does not "prescribe[] a course of action for an employee to follow," the first prong of the discretionary function analysis is satisfied.  *See* Fang, 140 F.3d at 1241.  The same legal presumption and undisputed facts that satisfy the second prong of the analysis vis a vis Grandy's metal detector claim satisfy the second prong of the analysis vis a vis this "general search" claim.  *See* Weissich, 4 F.3d at 814.

3.   Alleged Failure to Monitor Unit 6A After Entry

Grandy's final claim is that Officer Raygoza failed to monitor the unit once Wiggins gained entry.  (Grandy's Motion at 6)  This claim is also barred by the discretionary function exception, for the same reasons that the prior search-related claim is barred:  the manner in which searches of inmates and housing units was conducted was within the officer's discretion, and the conferring of that discretion was grounded in policy.

II.  TO THE EXTENT THAT GRANDY'S CLAIMS ARE NOT BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION, THEY FAIL ON THE MERITS.

A.   Defendant Breached No Duty Owed to Grandy.

Grandy has offered no evidence establishing that Officer Raygoza breached the general duty of safekeeping.  Prison officials determined that Wiggins' entry into Unit 6A was an error, in violation of the rule prohibiting inmates from entering their non-residential housing units without proper authorization.  However, Grandy has not presented evidence, nor can he, that the error resulted from negligence on the part of Officer Raygoza.  Not a single witness -- "eye-witness" inmate Ashfield included --

1  has given testimony regarding the particulars of Wiggins' entry.

2  Ashfield merely recalled that he saw Wiggins enter the unit; he

3  was able to give no information about how Wiggins gained entry

4  and, most notably, he did not state that Wiggins bypassed the

5  metal detector.

6      Similarly, there is no admissible evidence in the record

7  that Officer Raygoza was inattentive or distracted or confused

8  about open movement policy at the time that Wiggins entered the

9  unit.  To the contrary, Officer Raygoza testified that he

10 understood and abided by the rules restricting inmate movement.

11 Moreover, Ashfield admitted that Raygoza was vigilant in

12 monitoring the inmates who were entering the unit.  In fact,

13 Ashfield recalled seeing Officer Raygoza positioned at the door

14 just outside the building "watching everybody that comes in the

15 unit." (Ashfield Depo. 17:12-18:6, attached to the Declaration

16 of Ira A. Daves supporting Defendant's Motion)  Finally, Officer

17 Raygoza testified that he operated the metal detector that day.

18 (Raygoza Depo. 55:12-22)  It is undisputed that the metal

19 detector did not alert.

20     The testimony of Grandy's fellow inmate Ashfield that he,

21 himself bypassed the metal detector while Officer Raygoza was

22 watching him -- as he purportedly "always" did -- does not

23 constitute evidence that the metal detector requirement was

24 waived for Wiggins on November 25, 2006.  Tellingly, Ashfield

25 never stated that he saw Wiggins, like him, bypass the metal

26 detector, while Officer Raygoza was watching.  He testified

27 merely that he saw Wiggins enter the unit and that, had the metal

28

21

1  detector alerted, Officer Raygoza would likely have made Wiggins

2  go back through it.   Testimony such as this is not probative of

3  whether Wiggins failed to go through the metal detector or that

4  Officer Raygoza knowingly or carelessly let non-resident Wiggins

5  go around the metal detector.[11]   In fact, it is undisputable that

6  Wiggins could have passed through the metal detector without it

7  alerting, since the weapons may not have been on his person, as

8  Officer Raygoza pointed out at his deposition.

9      In any event, as unlikely as it is that Officer Raygoza

10  waived the metal detector requirement for any of the inmates,

11  Ashfield was a resident whom Officer Raygoza routinely saw;

12  Wiggins was not; it does not follow that Officer Raygoza would

13  have reacted to a non-resident as he would a resident.   If

14  anything, Officer Raygoza was more apt to waive the metal

15  detector requirement for a resident inmate with whom he was

16  familiar than for a non-resident inmate he did not know.   Absent

17  some first-hand testimony (or other admissible evidence) of how

18  Wiggins was able to gain entry Unit 6A, there can be no triable

19

20      [11]   Similarly, Ashfield's statement that "[n]obody really
21  goes through it if they don't have to," (Ashfield Depo. 20:14-20;
    21:6-13) -- far from proving what it suggests, *i.e.*, that Officer
22  Raygoza did not require inmates to pass through the metal
    detector -- actually tends to show that inmates routinely went
23  through the metal detector because it was a requirement.   His
    subsequent testimony about Officer Raygoza's practice of
24  requiring inmates who triggered the metal detector to go back
    through it supports this interpretation.   Moreover, if Officer
25  Raygoza routinely let inmates bypass the metal detector, this
    witness presumably would have said so. outright, rather than hint
26  at it.   In any event, because this testimony is impermissibly
    vague and constitutes inadmissible lay opinion, it should be
27  stricken.   See Fed.R.Evid. 602 & 701.

28                            22

1  issue as to whether Officer Raygoza breached the duty of care.

2      B.    Defendant's Acts Or Omissions Did Not Cause Grandy's

3            Injuries.

4      Assuming, *arguendo*, that there is a triable issue as to

5  whether Officer Raygoza breached the duty of care, judgment

6  should still be entered in favor of Defendant, as a matter of

7  law.  That is because a triable issue of causation can exist only

8  if there is evidence that the alleged breach proximately caused

9  Grandy's injuries.  There is no such evidence in the record.

10     Under California law, proximate cause "is that cause which,

11 in natural and continuous sequence, unbroken by any efficient

12 intervening cause, produced the injury . . . and without which

13 such result would not have occurred."  State v. Superior Court of

14 Sacramento County, 150 Cal.App.3d 848, 857, 197 Cal.Rptr. 914,

15 920 (1984).  A superseding cause is an intervening act that

16 relieves a negligent actor of liability.  *See* Werkman v. Howard

17 Zink Corp., 97 Cal.App.2d 418, 218 P.2d 43, 47-48 (1950).  An

18 intervening act is a superseding cause if it is not foreseeable,

19 or is highly unusual or extraordinary.  Schrimsher v. Bryson, 58

20 Cal.App.3d 660, 130 Cal.Rptr. 125, 127 (1976).  When the

21 performance of a mandatory duty would not necessarily have

22 altered the course of events, the breach of duty cannot have been

23 the proximate cause of the injury.  *See* Superior Court of

24 Sacramento County, 150 Cal.App.3d at 857, 197 Cal.Rptr. At 920.

25     Because the failure to prohibit Wiggins from entering Unit

26 6A is the only conceivable basis for finding a breach of duty,

27 Wiggins' attack on Grandy would have to have been a foreseeable

28 consequence of that breach, and it was not.  The attack was a

23

1  highly unusual incident, from the perspective of a reasonable

2  prison official, since most inmates caught out-of-bounds did not

3  commit assaults on other inmates.  The evidence is undisputed and

4  undisputable that inmate-on-inmate violence attributable to

5  inmates being out-of-bounds was a rare occurrence at the

6  Penitentiary.  (Grant Dec. ¶ 19)  It is also undisputed that no

7  prison official knew prior to the incident that Grandy was at

8  risk of attack by Wiggins or any other inmate.  (*Id*. ¶ 6)[12]

9                              **CONCLUSION**

10      For all the foregoing reasons, Defendant requests that

11  Grandy's Motion be denied and that summary judgment be entered in

12  favor of Defendant.

13  Respectfully submitted,

14  DATED: June 21, 2010          ANDRÉ BIROTTE JR.
                                  United States Attorney
15                                LEON W. WEIDMAN
                                  Assistant United States Attorney
16                                Chief, Civil Division

17

18                                _____/S/_____
                                  IRA A. DAVES
19                                Assistant United States Attorney
                                  Attorneys for Defendant

20

21

22

23

24

25    _____

26       [12]  The assault could only be considered arguably
      foreseeable if Wiggins either (1) passed through the metal
27    detector with the weapons on his person, and the metal detector
      alerted without any response from Officer Raygoza, or (2) went
28    around the metal detector with weapons on his person while
      Officer Raygoza was watching.  There is no admissible evidence in
      the record supporting either scenario.