1    Anthony Boskovich, No. 121198
     Boskovich & Appleton
2    28 N. First Street, 6th Floor
     San Jose, California 95113-1210
3    policemisconduct@compuserve.com
     408-286-5150
4

5    Geoffrey D. Allen
     1730 Rhode Island Avenue, N.W., Suite 206
6    Washington, DC 20036
     geoffreyallen@verizon.net
7    202-778-1167

8    Attorneys for plaintiff JAMES GRANDY

9          **IN THE DISTRICT COURT OF THE UNITED STATES OF AMERICA**

10                    **CENTRAL DISTRICT OF CALIFORNIA**

11

12   JAMES GRANDY,                          )
                            *Plaintiff*,    )      No.  CV 09-01270 JHN RZx
13   v.                                     )
                                            )      STATEMENT OF GENUINE ISSUES
14                                          )      IN OPPOSITION TO MOTION FOR
     UNITED STATES OF AMERICA,              )      SUMMARY JUDGMENT
15   Department of Justice                  )
     950 Pennsylvania Ave., NW              )      Date: July 12, 2010
16   Washington, DC 20530,                  )      Time: 2:00 p.m.
                            *Defendant*.    )      Courtroom: 790 Roybal
17   _____       )      Judge: Honorable Jacqueline H. Nguyen

18

19         Plaintiff submits this statement of genuine issues pursuant to Central District of California

20   Local Rule 56-2 in opposition to the motion for summary judgement herein filed by defendant.

21         Facts 1 through 77 below correspond to the facts and supporting evidence presented in the

22   Statement of Uncontroverted Facts filed by the moving party.  These facts are followed by additional

23   material facts and supporting evidence showing a genuine issue.

24

25

26

27

28   Statement of Genuine Issues in
     Opposition to Motion for Summary Judgment                                    *Page 1*

*Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150*

| MOVING PARTY'S ALLEGED UNCONTROVERTED FACTS | RESPONSE TO OPPOSITION |
|---|---|
| 1.  At approximately 12:45 p.m. on November 25, 2006, Grandy was assaulted by another inmate, Chevon Wiggins ("Wiggins").  (Grant Dec. ¶ 2, referring to paragraph 2 of the Declaration of Shawn Grant, filed concurrently herewith.) | Undisputed. |
| 2.  Wiggins resided in a different housing unit in the Penitentiary. (*Id.*) | Undisputed. |
| 3.  After gaining entry into Grandy's housing unit ("Unit 6A"), Wiggins stabbed Grandy multiple times in his upper torso. (*Id.*). | Undisputed. |
| 4.  Following the assult, Grandy was airlifted to a nearby hospital, where he received prompt, professional medical care.  (*Id.* ¶ 3) | Undisputed. |
| 5.  Although Grandy eventually recovered from his wounds, he continues to suffer residual neurological deficits from the attack, including a spinous process fracture and partial brain sequard syndrome. (*Id* ¶ 4) | Undisputed.  However, Grandy suffers from Brown-Sequard Syndrome. Exhibit A to Declaration of Anthony Boskovich, report of plaintiff's medical expert Dr. Herbert Joseph dated 1 April 2010 and produced to defendant in this matter pursuant to rule. |

| | |
|---|---|
| 6. In the aftermath of the incident, prison officials recovered two metal weapons, one of which appeared to be a sharpened butter knife. (*Id.* ¶ 5) | Undisputed. |
| 7. Not only was Wiggins not assigned to Unit 6A, a general housing unit, but he had no prior official authorization to enter the unit and was found "out-of-bounds" when he assaulted Grandy. (*Id.*) | Undisputed. |
| 8. The evidence is undisputed that the attack was a random act of violence, related to gang activity at the Penitentiary.[1] | Objection as to information contained in the footnote as inadmissible character evidence, (Fed. Rules Evid., rule 404(b); *United States Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004)), irrelevant, and no foundation. The remainder is undisputed. |
| 9. At his deposition, Grandy denied knowing Wiggins prior to the assault; and there is no evidence that Wiggins knew Grandy before assaulting him. (*Id* ¶ 6; Grandy Depo. 38:16-18). | Undisputed. |
| 10. There is no evidence in the record that prison staff knew that Grandy was at risk of attack by Wiggins or any other inmate. (Grant Dec. ¶6; Raygoza Depo. 44:20-45:1; Grandy Depo. 42:6-17) | Disputed as misleading. All inmates are at risk of attack in a maximum security prison. (Exhibit B to Declaration of Anthony Boskovich, prison assault statistics) |
| 11. In fact, there is no evidence that | Disputed as misleading. There is a |

| | |
|---|---|
| Grandy had been threatened before the attack or had reason to believe that he was in any kind of danger. (Grandy Depo. 40:4-6) | significant threat of inmate violence in the prison as shown by the prison's own statistics. (Exhibit B to Declaration of Anthony Boskovich) |
| 12.  The Penitentiary in Victorville was a high security facility, housing the most violent level of inmate.  (*Id.* ¶ | Undisputed. |
| 13.  Decisions regarding how to position prison staff members were grounded n economic, social and political policies. | Undisputed, but incomplete.  These decisions were also based on penological and security considerations.  (Declaration of Joe McGrath) |
| 14.  Limitations on resources, played heavily into the Penitentiary's ability to monitor the inmate population in various areas, including the entrance to the inmate housing units. (*Id.*) | Objection, irrelevant.  Undisputed, but incomplete.  These decisions were also based on penological and security considerations.  (Declaration of Joe McGrath) |
| 15.  Prison staff focused resources on locations were inmates worked, resided, and received medical attention. | Undisputed. |
| 16.  The process of providing internal security, including decisions about the appropriate level and frequency of inmate monitoring during open movements, took into account movements needed to achieve inmate rehabilitative goals and to safeguard constitutional rights. (*Id.* ¶9) | Undisputed, but incomplete.  These decisions were also based on penological and security considerations.  (Declaration of Joe McGrath) |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| 17.  Freedom of movement within the general prison population was one aspect of the rehabilitative effort. (*Id.*) | Undisputed, but incomplete.  These decisions were also based on penological and security considerations.  (Declaration of Joe McGrath) |
| 18.  Prison officials determined that socialization objectives could only be met by allowing inmates, other than a small minority of the federal inmate population, the opportunity to move relatively freely throughout their housing units and other areas of the prison during normal daytime hours. | Disputed.  These decisions were also based on safety and security considerations. (Declaration of Joe McGrath) |
| 19. Inmates and staff at the Penitentiary in Victorville entered general housing units, such as Unit 6A, through a "sally port" area that was monitored by one unit officer and two video cameras. ((*Id.* ¶ 10; Grant Depo. 13:1-7) | Undisputed but incomplete.  There also was a metal detector that inmates were required to pass through.  (Grant Declaration, ¶¶ 10 - 11; Grant Depo, pp. 13:13 - 14:2 |
| 20.  The sally port consisted of:  (1) an outside door or slider that was operated by the control center, (2) a small room containing a metal detector, and (3) an inner door.  (Grant Dec. ¶ 10) | Undisputed. |
| 21.  Pursuant to BOP policy and practice, | Undisputed. |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

Page 5

| | |
|---|---|
| inmates entering the unit through the sally port area were required to pass through the metal detector, which was manned by the unit officer on duty.  (Grant Dec. ¶ 11; Grant Depo. 13:13-14:2) | |
| 22.  Resident inmates were permitted to traverse the sally port area, through the metal detector, during routinely scheduled, controlled "open movements."  (Grant Dec. ¶ 11) | Undisputed. |
| 23.  During an open movement, which typically lasted for approximately ten (10) minutes, inmates were allowed to access other departments within the Penitentiary, such as the Commissary, Recreation Yard, and Dining Hall.  (*Id.*) | Undisputed. |
| 24.  The unit officer was required to be posted at the unit entrance during open movements.  (*Id.*) | Undisputed. |
| 25.  As much as reasonably possible, it was the responsibility of the unit officer to ensure that all inmates entering the unit passed through the metal detector.  ((*Id.*; Grant Depo. 25:13-15) | Disputed.  The policy of the prison required that all inmates pass through the metal detector and there is no evidence that the unit officer had any discretion to waive that requirement.  (Exhibit C to Declaration of Anthony Boskovich, Post Orders, p. 23; |

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

*Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150*

| | |
|---|---|
| | Exhibit D to Declaration of Anthony Boskovich Grandy Depo, p. 16:2-25 |
| 26.  Absent a metal detector alert, BOP policy and practice gave officers manning the housing unit entrances wide discretion as to when and how to search inmates for weapons.  (Grant Dec. ¶ 12) | Disputed as to term "wide discretion".  Officers had discretion within limits as to when and how to search inmates.  (Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 21-23) |
| 27.  Specifically, Title 28 C.F.R. § 552.10 authorized the BOP to conduct "searches of inmates and of inmate housing and work areas" and, moreover, directed staff to "employ the least intrusive method of search practicable, as indicated by the type of contraband and the method of suspected introduction."  (*Id.* ¶ 12; Request for Judicial Notice) | Undisputed, but incomplete.  The prison itself had written policies with respect to inmate searches that were more specific that the regulation.  (Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 21-23) |
| 28.  The regulation did not mandate that prison officials conduct housing entrance searches in a particular manner.  (*Id.*) | Undisputed, but incomplete.  The prison itself had written policies with respect to inmate searches that were more specific that the regulation.  (Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 21-23) |
| 29.  To the contrary, the regulation explicitly conferred discretion on prison staff to decide how to search inmates in | Undisputed, but incomplete.  The prison itself had written policies with respect to inmate searches that were more specific |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| view of the particular threat presented and the practicalities of the situation.  (*Id.*) | that the regulation.  (Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 21-23) |
| 30.  Furthermore, the judgment of unit officers about when and how extensively to search inmates and their cells was informed by their professional training and experience.  (Grant Dec. ¶ 13) | Undisputed, but incomplete.  The prison itself had written policies with respect to inmate searches that were more specific that the regulation.  (Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 21-23) |
| 31.  That judgment involved a balancing of all the potential risks that inevitably arise in a prison setting -- where antisocial persons co-exist and sometimes engage in violent, explosive conduct that is often difficult to predict -- against the inmates' interest in being free from overly intrusive searches.  (*Id.*) | Objection, argumentative. Undisputed, but incomplete.  The prison itself had written policies with respect to inmate searches that were more specific that the regulation.  (Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 21-23) |
| 32.  Although unit officers conducted routine pat searches of inmates in order to deter the flow of contraband, for example, they had discretion in determining who to pat down and under what circumstances. (*Id.*) | Undisputed, but incomplete.  For example, if an inmate alerted the metal detector, the officer was required to ensure that inmates cleared the metal detector. (Exhibit C to Declaration of Anthony Boskovich, Post orders, p. 23) |
| 33.  It was against policy and practice for | Undisputed. |

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| non-resident inmates to enter other housing units without the express permission or authorization of prison officials.  ((*Id.* ¶ 14; Allison Depo. 28; Grant Depo. 12:16-21) | |
| 34.  However, the presence of non-resident inmates in a general housing unit, such as Unit 6A, was not uncommon. (Grant Dec. ¶ 14) | Objection, vague as to term "not uncommon".  Undisputed to the extent that the statement admits that defendant and its agents were on notice that its prison in Victorville of frequent security breaches prior to the attack on plaintiff. |
| 35.  For example, a non-resident inmate might be granted authorization to enter another housing unit for purposes of performing a work detail.  ((*Id.* ¶ 14; Grant Depo. 16:12-20) | Undisputed, but irrelevant.  Inmate Wiggins was not on a work detail and was not allowed in plaintiff's unit when he entered. Exhibit E to Declaration of Anthony Boskovich, Responses to Requests for Admissions, Request 16) |
| 36.  Moreover, unit officers routinely prevented inmates from entering housing units to which they were not assigned. (Grant Dec. ¶ 15) | Undisputed, but irrelevant.  Inmate Wiggins was not prevented from entering plaintiff's housing unit despite the fact that he was not allowed to be there by policy. (Declaration of Horatio Demarious Smith) |
| 37.  Nevertheless, transgressions did occur, from time to time, given the interests in allowing movement of inmates | Objection, argumentative, no foundation.<br><br>Disputed.  Officers were granted no |

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

Page 9

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113 (408) 286-5150

| | |
|---|---|
| and avoiding overly intrusive searches. (*Id.*) | discretion regarding the prohibition against permitting inmates entering other housing units. (Exhibits F and C to Declaration of Anthony Boskovich, Defendant's Answers to Interrogatories, Interrogatory 14, Post orders, pp. 9, 11, 23) Transgressions also occurred due to officer negligence. |
| 38. Nevertheless, transgressions did occur, from time to time, given the interests in allowing movement of inmates and avoiding overly intrusive searches. (*Id.*) | Objection, argumentative, no foundation.<br><br>Disputed as incomplete. Transgressions also occurred due to officer negligence by not performing their duty to properly monitor inmates. . (Exhibits F and C to Declaration of Anthony Boskovich, Defendant's Answers to Interrogatories, Interrogatory 14, Post orders, pp. 9, 11, 23) |
| 39. First, there were over one hundred fifteen inmates assigned to each unit, and the unit officer was responsible for many other duties, such as searching cells, conducting rounds, and performing counts. (*Id.*) | Undisputed but incomplete. The policy of the prison required that all inmates pass through the metal detector and there is no evidence that the unit officer had any discretion to waive that requirement. (Exhibits F, C, and D to Declaration of Anthony Boskovich, Defendant's Answers to Interrogatories, Interrogatory 14, Post orders, pp. 9, 11, 23; Grandy Depo, p. 16:2-25 ) |
| 40. Second, unit officers were often | Undisputed, but incomplete. |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113 (408) 286-5150

| | |
|---|---|
| unfamiliar with inmates residing in units they were charged with watching because the officers were frequently rotated among units, especially if they were substituting for absent employees.  (*Id.*) | Competing priorities in housing units with high numbers of prisoners can make compliance with unit security procedures and prisoner accountability challenging for staff. Nonetheless, prisoner movement and accountability procedures must be followed to reduce the risk of escape or serious incident. Often the crowded conditions and multiple demands placed on a housing unit officer require an approach of conducting security processes slowly and deliberately to avoid breaches in security and provide for prisoner accountability.  This may include taking time to check unit rosters and picture boards to positively identify unit residents during movement periods and census counts. (Declaration of McGrath, ¶ 12) Additionally, Raygoza had been assigned to housing Unit 6A for over a month and was familiar with the residents of 6A. (Exhibit D to Declaration of Anthony Boskovich, Grandy Depo, p. 47:9-19) |
| 41.  Third, inmates often wore clothing, such as coats and caps, that sometimes obscured their faces and bodies.  (*Id.*) | Objection, vague as to term "often". Undisputed, but incomplete. Competing priorities in housing units with high numbers of prisoners can make compliance with unit |

| | security procedures and prisoner |
|---|---|
| | accountability challenging for staff. |
| | Nonetheless, prisoner movement and |
| | accountability procedures must be followed to |
| | reduce the risk of escape or serious incident. |
| | Often the crowded conditions and multiple |
| | demands placed on a housing unit officer |
| | require an approach of conducting security |
| | processes slowly and deliberately to avoid |
| | breaches in security and provide for prisoner |
| | accountability.  This may include taking time |
| | to check unit rosters and picture boards to |
| | positively identify unit residents during |
| | movement periods and census counts. |
| | (Declaration of McGrath, ¶ 12) |
| 42.  Finally, depending upon the day, large numbers of inmates entered and left the unit in rapid succession, which could further complicate the process of inmate identification.  (*Id.*) | Undisputed, but incomplete. Competing priorities in housing units with high numbers of prisoners can make compliance with unit security procedures and prisoner accountability challenging for staff. Nonetheless, prisoner movement and accountability procedures must be followed to reduce the risk of escape or serious incident. Often the crowded conditions and multiple demands placed on a housing unit officer require an approach of conducting security |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | processes slowly and deliberately to avoid breaches in security and provide for prisoner accountability.  This may include taking time to check unit rosters and picture boards to positively identify unit residents during movement periods and census counts. (Declaration of McGrath, ¶ 12) Additionally, disputed as to the way in which inmates were entering plaintiff's unit on the date of the incident.  (See generally, Exhibit G to Declaration of Anthony Boskovich Raygoza Depo.) |
|---|---|
| 43.  Given the difficulties inherent in tracking inmates during open movements, randomly scheduled census counts were conducted after open movements ended and the unit doors were secured so as to double-check the location of inmates and determine if any were out-of-bounds.  (*Id.* ¶ 17) | Undisputed, but incomplete.  Randomly scheduled census counts are scheduled following open movement periods to determine, as a double check, that prisoners are properly located and none are out-of-bounds within the housing unit.  Because it is difficult for staff to know the identity of each assigned prisoner in a housing unit, identification rosters and a picture board, identifying each prisoner by name, register number and cell assignment is available to staff in each housing unit.  When staff is unsure about the identity of a prisoner(s), it is his or her responsibility to use |

| | these resources to determine positive identity. (Declaration of McGrath, ¶ 6) Additionally, Wiggins' presence in 6A was undetected despite the fact that he remained on the unit for at least forty five minutes.  (Exhibit G to Declaration of Anthony Boskovich, Raygoza Depo, pp. 112-13) |
| --- | --- |
| 44.  Transgressions were taken seriously, and inmates caught out-of-bounds were subject to discipline.  (*Id.* ¶ 18) | Disputed, Officer Raygoza was unaware of the policy and was never disciplined nor counseled regarding his allowance of inmate Wiggins into the unit. (Compare Exhibit G to Declaration of AMB, Raygoza Depo, pp. 40-43, with Exhibit C to Declaration of Anthony Boskovich, Post orders, pp. 9, 11, 23) This argues against the statement that these events were taken seriously because, at the least, unit officers were not meaningfully required to comply with the policy and it was a common occurrence.  (Grant Dec., ¶ 14) |
| 45.  Typically, an inmate caught out-of-bounds would be issued an incident report.  (*Id.*) | Disputed, Officer Raygoza was unaware of the policy and was never disciplined nor counseled regarding his allowance of inmate Wiggins into the unit. (Exhibit G to Declaration of Anthony |

Law Offices of Anthony Boskovich 28 North First Street, 6ᵗʰ Floor, San Jose, CA 95113  (408) 286-5150

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

| | |
|---|---|
| | Boskovich, Deposition of Ray Raygoza, pp. 40-43; Exhibit F to Declaration of Anthony Boskovich, Response to Interrogatory 20) This argues against the statement that these events were taken seriously because, at the least, unit officers were not meaningfully required to comply with the policy and it was a common occurrence.  (Grant Dec., ¶ 14 ) |
| 46.  Although possible, actual inmate-on-inmate violence attributable to inmates being out-of-bounds was a rare occurrence at the Penitentiary.  (*Id.* ¶ 19) | Disputed as misleading.  Inmate-on-inmate violence was not an uncommon occurrence, was foreseeable, and if there was a small frequency of assaults by out-of-bounds inmates, that was most likely due to the procedures in place preventing inmates from entering other housing units with weapons. (Declaration of Joe McGrath, ¶¶ 12-13; Exhibit B to Declaration of Anthony Boskovich, inmate assault statistics) |
| 47.  As much as reasonably possible, given the number of inmates entering and leaving the unit at any particular time as well as unanticipated distractions, it was the responsibility of the unit officer manning the entrance to identify and deny access to any non-resident inmates attempting to enter the unit without | Disputed as to term as much "as possible" and misleading.  The statement minimizes the officer's duty and the tools at his or her disposal to enforce the policy, such as picture boards and taking more time in the performance of checks.  (Declaration of Joe McGrath, ¶ 12) Undisputed that it was the absolute responsibility of the officer manning |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| permission.  (Grant Dec. ¶ 20; Grant Depo. 12:16-21; 14:3-20; 31:16-21) | the unit to ensure that non-resident inmates did not enter housing units to which they were not assigned. |
| 48.  It was also the responsibility of the unit officer to ensure that the entrance to the unit was locked at the conclusion of the open movement and, subsequent to movement, conduct a census check to ensure that only residents or authorized non-resident inmates were present in the unit.  (Grant Dec. ¶ 20; Grant Depo. 15:6-15) | Undisputed. |
| 49.  However, there was no requirement that the unit officer, or any staff member, maintain constant eye contact on every inmate during open movements.  (Grant Dec. ¶ 20) | Disputed.  As to inmates entering housing units there was a requirement that officers visually observe each inmate entering the unit. (Exhibit C to Declaration of Anthony Boskovich, Post orders, p. 23) |
| 50.  The unit officer on duty at Unit 6A at the time of the assault was Ray Raygoza ("Officer Raygoza").  (*Id.* ¶ 22; Raygoza Depo. 43:10-12) | Undisputed. |
| 51.  Officer Raygoza assumed his duties on November 25, 2006 at 8:00 a.m., and he manned his station during the 9:00 | Undisputed. |

Law Offices of Anthony Boskovich 28 North First Street, 6ᵗʰ Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| a.m. and Noon open movements that preceded the assault on Grandy.  (*Id.*) | |
| 52.  Officer Raygoza conducted a census check beginning at 10:00 a.m. on the date of the incident.  (*Id.* ¶ 27)  Unit 6A went on "lockdown" following the assault on Grandy at 12:44 p.m.  (*Id.*) | Undisputed. |
| 53.  It is undisputed that Wiggins did not have prior official authorization to enter Unit 6A and was found to have been out-of-bounds when he assaulted Grandy.  (*Id.* ¶ 23) | Undisputed. |
| 54.  It is further undisputed that Wiggins entered Unit 6A on Officer Raygoza's watch.  (Raygoza Depo. 67:1-3) | Undisputed. |
| 55. Further, there are no first-hand accounts regarding the particulars of Wiggins entry:  there is no testimony as to whether Officer Raygoza stopped and questioned Wiggins prior to permitting him into the unit, and there is no testimony as to whether Wiggins presented to Officer Raygoza some form of written or verbal request or prior authorization to enter. | Disputed.  Horatio Smith saw inmate Wiggins enter the unit and bypass the metal detector while Officer Raygoza looked the other way.  (Declaration of Horatio Demarious Smith) Inmate Woodie Mack Ashfield indicates that Wiggins walked right past Officer Raygoza.  (Exhibit H to Declaration of Anthony Boskovich, Ashfield Depo, pp. 12-17) Neither witness indicated that Officer Raygoza did anything with |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113 (408) 286-5150

| | |
|---|---|
| | respect to Wiggins. |
| 56.  Officer Raygoza testified that inmates entering Unit 6A were required to pass through the metal detector, which he operated on the day in question, and there is no evidence that Officer Raygoza permitted Wiggins to enter Unit 6A without requiring him to pass through the metal detector.  (*Id.* ¶ 23; Raygoza Depo. 113:9-15; 126:21-127:2) | Disputed.  Horatio Smith saw inmate Wiggins enter the unit and bypass the metal detector while Officer Raygoza looked the other way.  (Declaration of Horatio Demarious Smith) Inmate Ashfield testified that he was immediately behind Wiggins and that he (Ashfield) bypassed the metal detector. (Exhibit H to Declaration of Anthony Boskovich, Ashfield Depo, pp. 12-17) |
| 57.  There is no evidence that Officer Raygoza had prior knowledge of the gang tensions that led to Wiggins' attack on Grandy.  (*Id.* ¶ 25) | Undisputed. |
| 58.  All that is known is that Officer Raygoza permitted Wiggins  entry, perhaps assuming in error that he was a resident or otherwise had official authorization or some legitimate reason to enter.  (*Id.* ¶ 25) | Disputed.  Horatio Smith saw inmate Wiggins enter the unit and bypass the metal detector while Officer Raygoza looked the other way.  (Declaration of Horatio Demarious Smith)  Inmate Ashfield testified that he was immediately behind Wiggins and that he (Ashfield) bypassed the metal detector. (Exhibit H to Declaration of Anthony Boskovich, Ashfield Depo, pp. 12-17) |
| 59. At his deposition, Officer Raygoza | Undisputed. |

| | |
|---|---|
| could not recall the circumstances of Wiggins' entry, but he admitted that it was his responsibility to make sure that unauthorized persons did not enter his unit and he acknowledged that he might have knowingly permitted the entry. (Raygoza Depo. 69:6-9; 87:15-18)[2] | |
| 60. USP Victorville was a new facility at the time, and many new inmates were being received each week.  (Grant Dec. ¶ 25) | Objection, vague as to term "many new inmates". |
| 61.  As for the presence of the weapons used by Wiggins in the attack on Grandy, it is undisputed that, when non-resident Wiggins entered Unit 6A, the metal detector did not alert.  (Grant Dec. ¶ 26) | Undisputed, but misleading.  Inmate Wiggins did not go through the metal detector.  (Declaration of Horatio Demarious Smith) |
| 62.  The metal detector was in place at the time and there is no evidence that the metal detector malfunctioned that afternoon.  (*Id.*; Raygoza Depo. 55:15-17) | Undisputed, but irrelevant.  Inmate Wiggins did not go through the metal detector.  (Declaration of Horatio Demarious Smith) |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| 63. It is undisputed that the metal weapons recovered after the attack would have triggered the metal detector, assuming that it was properly functioning that afternoon. (Grant Dec. ¶ 26) | Undisputed, but irrelevant. Inmate Wiggins did not go through the metal detector. (Declaration of Horatio Demarious Smith) |
| 64. And no witness reported seeing Wiggins enter the unit with weapons on his person. (*Id.*) | Undisputed. |
| 65. Officer Raygoza testified that the weapon used to attack Grandy "could have easily been inside the housing unit already when inmate Wiggins went into the unit." (Raygoza Depo. 54:10-14) | Undisputed, but irrelevant. The weapon should not have been inside the unit in any event. |
| 66. To establish a breach of duty by Officer Raygoza, Grandy will likely rely upon deposition testimony provided by one of his fellow resident inmates, Woodie Ashfield ("Ashfield"). | Undisputed, but incomplete. Plaintiff also relies on the Declaration of Horatio Demarious Smith. |
| 67. Ashfield suggested at his deposition that, on the day in question, Officer Raygoza permitted certain inmates to walk around the metal detector. | Undisputed, but irrelevant. Officer Raygoza was looking the other way when inmate Wiggins entered and bypassed the metal detector. (Declaration of Horatio Demarious Smith) |
| 68. He testified that, during the Noon | Undisputed, but irrelevant. Officer |

Law Offices of Anthony Boskovich 28 North First Street, 6*th* Floor, San Jose, CA 95113  (408) 286-5150

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| open movement, he observed Officer Raygoza monitoring the movement of the inmates as they entered the unit.  (Ashfield Depo. 5:18-21; 15:9-13) | Raygoza was looking the other way when inmate Wiggins entered and bypassed the metal detector.  (Declaration of Horatio Demarious Smith) |
| 69.  Ashfield provided an eye-witness account in which he recalled seeing Officer Raygoza positioned at the door just outside the building "watching everybody that comes in the unit." (Ashfield Depo. 17:12-18:6) | Undisputed, but irrelevant.  Officer Raygoza was looking the other way when inmate Wiggins entered and bypassed the metal detector.  (Declaration of Horatio Demarious Smith) |
| 70.  He further recalled that he and Officer Raygoza "locked eyes."  (*Id.*) | Undisputed, but irrelevant.  Officer Raygoza was looking the other way when inmate Wiggins entered and bypassed the metal detector.  (Declaration of Horatio Demarious Smith) |
| 71.  Ashfield testified that, when he entered the unit, he himself did not pass through the metal detector, that he "always" walked past it, and that "[n]obody really goes through it if they don't have to."  (*Id.* 20:14-20; 21:6-13) | Undisputed. |
| 72.  Finally, Ashfield inmate added that he observed non-resident Wiggins walk past Officer Raygoza as he entered the unit. (Ashfield Depo. 12:11-13:4; 13:20-14:4) | Undisputed. |

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113 (408) 286-5150

| | |
|---|---|
| 73.  Tellingly, Ashfield, a resident of Unit 6A, did not testify that he saw Wiggins, a non-resident, go around the metal detector, much less that he did so while Officer Raygoza was watching. Moreover, this inmate admitted that, as a matter of practice, Officer Raygoza was vigilant to metal detector alerts and would routinely instruct inmates to go through the metal detector again if it alerted: | Objection, argumentative. Undisputed, but irrelevant.  Officer Raygoza was looking the other way when inmate Wiggins entered and bypassed the metal detector.  (Declaration of Horatio Demarious Smith) |

> Q   Do you know whether or not Officer Raygoza was looking at the area where the metal detector was at the time the assailant entered the unit?
>
> A   No, but he walked past him. Because that's the only way he could have gotten in there is to walk past him and he watches everybody that goes in there, and if it would have went off, he would have cut his neck around and probably told him to try it again.
>
> Q   All right.
>
> A   I say that because that's what he

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113 (408) 286-5150

| | |
|---|---|
| tells everybody, try it again. (*Id.* 16:15-17:5) | |
| 74. Grandy did not depose Wiggins about how he was able to obtain entry into Unit 6A. | Undisputed, but irrelevant. Officer Raygoza was looking the other way when inmate Wiggins entered and bypassed the metal detector. (Declaration of Horatio Demarious Smith) |
| 75. BOP officials referred the case to the Federal Bureau of Investigation ("FBI") for prosecution. (Grant Dec. ¶ 28) | Undisputed. |
| 76. The FBI investigated the matter and, for reasons that are irrelevant to this motion, declined to prosecute Wiggins. (*Id.*) | Undisputed. |
| 77. Subsequently, the prison officials at USP Victorville investigated the matter and determined that, however unfortunate the incident, staff discipline was not warranted. (*Id.*) | Disputed. The investigation focused on housing of inmates after the assault and did not even consider whether Raygoza was derelict in his duties. (Exhibit I to Declaration of Anthony Boskovich, Allison Depo. 11:17-12:21) |
| | |
| | |
| MOVING PARTY'S CONCLUSIONS OF LAW | RESPONSE |

| | |
|---|---|
| 1.  Grandy alleges that Wiggins was able to stab him because Officer Raygoza was negligent in operating the metal detector at the entrance to Unit 6A on the day in question.  (Grandy Depo. 11:5-13) Grandy contends that proper operation of the metal detector would have revealed Wiggins to be a non-resident and, further, would have uncovered the weapons Wiggins used in the assault.  (*Id.*)  As set forth below, Grandy cannot produce admissible evidence sufficient to raise genuine issues of material fact on these claims. | Disputed.  Plaintiff has substantial evidence of negligence and proximate cause. (See Declarations of Anthony Boskovich, Joe McGrath, and Horatio Demarious Smith) |
| 2.  The FTCA constitutes a limited waiver of sovereign immunity for the United States and, with certain exceptions, renders the federal government liable in tort for the conduct of its employees as a private person would be in like circumstances.  28 U.S.C. § 1346(b). Section 1346(b) of the FTCA in conjunction with the language of 28 U.S.C. § 2674 preconditions liability and jurisdiction upon proof of an actionable | Undisputed. |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Law Offices of Anthony Boskovich 28 North First Street, 6ᵗʰ Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| duty, causation and recoverable damages under the law of the state wherein the conduct complained of occurred.  Here, California law applies. | |
| 3. For liability to exist under California law, there first must be a legal duty owed that was breached.  <u>Nally v. Grace Community Church</u>, 47 Cal.3d 278, 292, 253 Cal.Rptr. 97 (1988), *cert. denied*, 490 U.S. 1007 (1989).  Second, that breach of duty must be a proximate or legal cause of the plaintiff's injuries.  <u>Ambriz v. Kelegian</u>, 146 Cal.App.4th 1519, 53 Cal.Rptr.3d 700, 708 (2007).[3] | Undisputed. |
| 4.  The Ninth Circuit has found that the acts of performing inmate searches and of providing inmate security are unique to the context of prisons; they are "core prison functions for which there are no private-sector analogues."  <u>Alfrey v. United States</u>, 276 F.3d 557, 566 (9th Cir. 2002).  18 U.S.C. § 4042 imposes only a general duty of care on the BOP, providing federal prisoners a possible right | Undisputed. |

| | |
|---|---|
| of action against the United States for injuries allegedly sustained while incarcerated.  *See* United States v. Muniz, 374 U.S. 150, 153, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); Cohen v. United States, 151 F.3d 1338, 1342 (11th Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999); Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997).  Under Section 4042, the BOP, under the direction of the Attorney General, shall provide for the safekeeping, care, and protection of inmates in its custody.  18 U.S.C. § 4042(a)(2) & (3). | |
| 5.  Notably, section 4042 does not direct the manner by which the BOP must fulfill this duty.  *See* Cohen, 151 F.3d at 1343-45; Calderon, 123 F.3d at 950.  It sets forth no particular conduct that the BOP personnel must or should engage in or avoid while attempting to fulfill their duty to protect inmates.  It merely "requires the exercise of ordinary diligence to keep prisoners safe and free from harm."  Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976), *cert. denied*, 429 U.S. 978 (1976).  It | Undisputed. |

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

<table>
<tr>
<td>

follows, therefore, that determining whether a breach of the duty of safekeeping occurred turns on an ordinary negligence analysis that assesses the "reasonableness" of the officer's conduct under the particular circumstances of the case.  *See* <u>Flowers v. Torrance Memorial Hospital Medical Center</u>, 8 Cal.4th 992, 997-98, 35 Cal.Rptr.2d 685 (1994).

</td>
<td>

</td>
</tr>
<tr>
<td>

6.  The first issue is whether Officer Raygoza breached a duty of safekeeping by failing to prohibit Wiggins from entering Unit 6A.  Prison officials determined that Wiggins' entry into Unit 6A as an error, in violation of the rule prohibiting inmates from entering their non-residential housing units without proper authorization.  However, Grandy cannot present evidence that the error resulted from negligence on the part of Officer Raygoza.  Not a single witness, Grandy's eye-witness inmate Ashfield included, has given testimony regarding the particulars of Wiggins' entry.  Ashfield merely recalled  that he saw Wiggins enter

</td>
<td>

Disputed. Two witnesses have given accounts of Wiggins, entry.  Both of these indicate that Wiggins walked past Officer Raygoza without being challenged. Smith indicates he by-passed the metal detector. Ashfield's testimony indicates that at that time, Officer Raygoza was not monitoring the metal detector since he by-passed it without challenge.  (Declaration of Horatio Demarious Smith; Exhibit H to Declaration of Anthony Boskovich, Ashfield depo pages 12-17)

</td>
</tr>
</table>

the unit; he was able to give no information about how Wiggins gained entry and, most notably, he did not state that Wiggins bypassed the metal detector. For all anyone knows, Wiggins gained entry to Unit 6A by subterfuge, such as presentation to Office Raygoza of a false identification card.

| | |
|---|---|
| 7.  Similarly, there is no admissible evidence in the record that Officer Raygoza was inattentive or distracted or confused about open movement policy at the time that Wiggins entered the unit. To the contrary, Officer Raygoza testified that he understood and abided by the rules restricting inmate movement and, moreover, Grandy's eye-witness Ashfield freely admitted that Raygoza was vigilant in monitoring the inmates who were entering the unit.  In fact, Ashfield recalled seeing Officer Raygoza positioned at the door just outside the building "watching everybody that comes in the unit."  (Ashfield Depo. 17:12-18:6) Finally, Officer Raygoza testified that he | Disputed.  There is an abundance of evidence that Officer Raygoza believed that inmates from other housing units could visit other housing units during periods of open movement.  It is undisputed that this is not the policy.   It is a mischaracterization of Ashfield's testimony to claim that he "freely admitted" Raygoza was vigilant. On the contrary Raygoza allowed Wiggins to walk right past him without challenge. (Exhibit H to Declaration of Anthony Boskovich, Ashfield depo pages 12-17) There is clear evidence that Raygoza was not observing the metal detector or requiring inmate to pass through it at the time both Ashfield and Wiggins entered the unit.  (*Ibid.*; Declaration of Horatio Demarious Smith)  Officer |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| operated the metal detector that day. (Raygoza Depo. 55:12-22)  It is undisputed that the metal detector did not alert. | Raygoza was in charge of the metal detector that day.  However, there is clear evidence that he was not in fact requiring inmates to pass through it as he was required to do. |
| 8. The testimony of Grandy's fellow inmate Ashfield that he, himself bypassed the metal detector while Officer Raygoza was watching him -- as he purportedly "always" did -- does not constitute evidence that the metal detector requirement was waived for Wiggins on November 25, 2006.  Tellingly, Grandy's eyewitness never stated that he saw Wiggins, like him, bypass the metal detector, while Officer Raygoza was watching.  He was careful, in fact, not to make any such assertion.  He testified merely that he saw Wiggins enter the unit and that, had the metal detector alerted, Officer Raygoza would likely have made Wiggins go back through it.  Testimony such as this is not probative of whether Wiggins failed to go through the metal detector or that Officer Raygoza knowingly or carelessly let non-resident | Ashfield's testimony is that he was right behind Wiggins and that he himself did not go through the metal detector which is probative of Raygoza's inattention to the metal detector at this time.   Additionally, Horatio Smith personally observe Wiggins bypass the metal detector as Officer Raygoza looked the other way.  (Declaration of Horatio Demarious Smith; Exhibit H to Declaration of Anthony Boskovich, Ashfield depo pages 12-17) |

| | |
|---|---|
| Wiggins go around the metal detector.[4] In fact, it is undisputable that Wiggins could have passed through the metal detector without it alerting, since the weapons may not have been on his person, as Officer Raygoza pointed out at his deposition. | |
| 9.  In any event, as unlikely as it is that Officer Raygoza waived the metal detector requirement for any of the inmates, Ashfield was a resident whom Officer Raygoza routinely saw; Wiggins was not; it does not follow that Officer Raygoza would have reacted to a non-resident as he would a resident.  If anything, Officer Raygoza was more apt to waive the metal detector requirement for a resident inmate with whom he was familiar than for a non-resident inmate he did not know.  Absent some first-hand testimony (or other admissible evidence) of how Wiggins was able to gain entry Unit 6A, there can be no triable issue as to whether Officer Raygoza breached the duty of care. | Disputed.  It is equally unlikely that Raygoza would simply let a person who he did not recognize as a resident, simply walk onto the unit– but the evidence is clear that this is what he did.  Certainly, someone paying so little attention to his duties is quite likely, seconds later, to be equally inattentive to requiring inmates to pass through the metal detector. The Declaration of Horatio Smith provides first hand testimony that in fact, Wiggins did by-pass the metal detector. (Declaration of Horatio Demarious Smith; Exhibit H to Declaration of Anthony Boskovich, Ashfield depo pages 12-17) |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

| | |
|---|---|
| 10.  Assuming, *arguendo*, that there is a triable issue as to whether Officer Raygoza breached the duty of care, judgment should still be entered, as a matter of law, in favor of Defendant. That is because a triable issue of causation can exist only if there is evidence that the alleged breach proximately caused Grandy's injuries.  There is no such evidence in the record. | Defendant is once again incorrect.<br><br>    In *Landeros v. Flood*, 17 Cal.3d 399 (Cal. 1976), the court addressed those situations where criminal activity against a plaintiff follows the defendant's alleged negligence; that is, when an intervening act by a criminal constitutes the immediate cause in fact of the plaintiff's injuries for which the plaintiff seeks to recover against the defendant. The *Landeros* court said: "It is well settled in this state … an intervening act does not amount to a 'superseding cause' relieving the negligent defendant of liability … if it was reasonably foreseeable: '[A]n actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct.' [Citation] Moreover, under section 449 of the Restatement Second of Torts that foreseeability may arise directly from the risk created by the original act of negligence: 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.' (Italics added.) [Citation.]" *Raven H. V. Gamette*, 157 Cal.App.4th 1017, 1030 (Cal.App. 2008); see also, *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1208-09 (9th Cir. 2003))<br><br>Under California law, "[f]oreseeability of harm should ordinarily be determined by a jury." (*Isaacs v. Huntington Memorial Hospital*, 38 Cal.3d 112, 135 (Cal. 1985)) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Failure to follow a policy designed to protect from a specific occurrence has been held to establish proximate cause.  In *Bullis v. Security Pacific National Bank*, 21 Cal.3d 801 (Cal. 1978), the defendant bank was found to be the proximate cause of loss by failing to follow its procedure and the custom and practice in the banking industry of requiring two signatures.  In holding that there was no superseding cause precluding a finding of proximate cause, the California Supreme Court stated:

> While Lampe's intentionally tortious conduct caused the estate's loss, his actions cannot insulate appellant from liability for its negligent conduct.  A person is liable for any injury proximately or substantially caused by his negligent conduct, even if a third person's conduct directly precipitates the injury. (Citation) "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." ( Rest.2d Torts, § 449, other citations omitted)
>
> The risk that one co-executor would act alone and make unauthorized withdrawals was significant in establishing the standard of care. The deviation from this standard allowed that very risk to become a reality in this case. Therefore, the occurrence of this foreseeable act does not break the

Statement of Genuine Issues in
Opposition to Motion for Summary Judgment

Page 32

chain of legal causation which holds appellant liable for the estate's loss. (Citation)

Appellant asserts that the imposition of liability would punish appellant for its failure "to control the conduct of another," i.e., Lampe. (Citation) This contention overlooks the fact that the trial court merely reaffirmed the obvious proposition that appellant owed a duty of due care to its depositors. Appellant was held liable for the estate's loss because its conduct, in opening and maintaining the estate's account, did not meet the standard of reasonable care expected of a bank. Its negligent conduct resulted in a reasonably foreseeable injury. Thus, liability was based on appellant's own negligence, not on a breach of any duty to control Lampe. (Citation)

(*Bullis*, *supra*, at 812-13)

In *Avitia v. United States*, 24 Fed. Appx. 771, 2001 U.S. App. LEXIS 26806 (9th Cir. 2001), the Ninth Circuit addressed this issue in the context of a patient assaulted by her doctor that occurred in part due to the violation of a policy in a clinic that a chaperone be provided in a gynecological examination. (*Id.* at 772-73) The United states made the same argument there that it makes here regarding proximate cause. The Ninth Circuit disagreed:

The United States' more forceful argument is that the clinic's (and its employee's) failure to follow the chaperone policy is not the proximate cause of Avitia's injuries because Shohayeb's assault on Avitia was a

superseding cause.  A superseding cause is an intervening act that relieves a negligent actor of liability. (*Werkman v. Howard Zink Corp.*, 97 Cal. App. 2d 418, 218 P.2d 43, 47-48 (Cal. 1950)) An intervening act is a superseding cause if it is not foreseeable, or is highly unusual or extraordinary. (*Schrimscher v. Bryson*, 58 Cal. App. 3d 660, 130 Cal. Rptr. 125, 127 (Cal. Ct. App. 1976)) The chaperone policy at the clinic at the time the complained-of assault took place was put in place in part to ensure patient safety.  It is no stretch of imagination that such safety concerns would include the prevention of the kind of inappropriate conduct complained of here.  If the policy was put in place to prevent such conduct, the assault was foreseeable and Shohayeb's intentional conduct did not supersede the negligent acts of the clinic and Barbosa.

(*Id.* at 774-75; accord, *Sheridan v. United States*, 487 U.S. 392, 401-02 (1988))

Such is the case here.  As the Declaration of Joe McGrath makes clear,

11.  Operational policies, procedures and protocols designed to search, control and  provide accountability for prisoners, such as those employed at USP, are calculated to reduce the risk of attempted escapes, violent assaults and the introduction and trafficking of dangerous contraband and weapons within the prison complex.  There is a basic tenet of high security corrections universally held by practitioners in the field that holds that whenever security practices designed to control prisoner movement and accountability are breeched, the likelihood of prisoner escape attempts, violent assaults and the trafficking of dangerous contraband and weapons increases significantly.  These outcomes are predictable when prisoners are not accounted for and

allowed to enter areas of the prison that are restricted to them.

It is equally clear that the prison had a clear and direct policy that inmates were not allowed in other housing units absent some special circumstances, not present here, and that all inmates entering the housing unit were to be screened through the metal detector.  (Exhibit Cto Declaration of Anthony Boskovich, at pp. 9, 11, 23)

Defendant's insinuation regarding the source of the weapon at footnote 5 is nothing but a red herring.  Inmate Wiggins should not have been allowed to bypass the metal detector with or without a weapon, and defendant has not presented any evidence that any inmate should be allowed to have possession of a metal knife in a maximum security prison housing unit because that is, quite frankly, an absurd proposition.  But it is undisputed that the weapon and Wiggins were there and in combination they committed the brutal assault on plaintiff.  Therefore, the causal connection, as argued above, is clear.

Finally, defendant's protestations

notwithstanding, inmate-on-inmate assaults with weapons were not a rare occurrence. By the prison's own statistics, for fiscal years 2005 and 2006 the frequency of assaults with weapons was from 56 to 69 assaults per 5000 inmates, a rate significantly higher than the average for federal prisons at the same security level. (See Exhibit B to Declaration of Anthony Boskovich)

Thus, under California and Federal law, the attack on plaintiff was foreseeable because the defendant had clear policies and procedures designed to prevent the very act that occurred, and but for the failure of Officer Raygoza to follow those procedures the attack on plaintiff would not have occurred. In sum, there is little question that the failure to follow established policies and procedures rendered the negligent conduct to be a proximate and legal cause of plaintiff's injuries.

11. Under California law, proximate cause "is that cause which, in natural and continuous sequence, unbroken by any

Disputed.

In *Landeros v. Flood*, 17 Cal.3d 399 (Cal. 1976), the court addressed those

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113 (408) 286-5150

efficient intervening cause, produced the injury . . . and without which such result would not have occurred." State v. Superior Court of Sacramento County, 150 Cal.App.3d 848, 857, 197 Cal.Rptr. 914, 920 (1984). A superseding cause is an intervening act that relieves a negligent actor of liability. See Werkman v. Howard Zink Corp., 97 Cal.App.2d 418, 218 P.2d 43, 47-48 (1950). An intervening act is a superseding cause if it is not foreseeable, or is highly unusual or extraordinary. Schrimsher v. Bryson, 58 Cal.App.3d 660, 130 Cal.Rptr. 125, 127 (1976). When the performance of a mandatory duty would not necessarily have altered the course of events, the breach of duty cannot have been the proximate cause of the injury. See Superior Court of Sacramento County, 150 Cal.App.3d at 857, 197 Cal.Rptr. At 920.

situations where criminal activity against a plaintiff follows the defendant's alleged negligence; that is, when an intervening act by a criminal constitutes the immediate cause in fact of the plaintiff's injuries for which the plaintiff seeks to recover against the defendant. The Landeros court said: "It is well settled in this state … an intervening act does not amount to a 'superseding cause' relieving the negligent defendant of liability … if it was reasonably foreseeable: '[A]n actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct.' [Citation] Moreover, under section 449 of the Restatement Second of Torts that foreseeability may arise directly from the risk created by the original act of negligence: 'If the likelihood that a third person may act in a particular manner is the hazard or

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.' (Italics added.) [Citation.]"

*Raven H. V. Gamette*, 157 Cal.App.4th 1017, 1030 (Cal.App. 2008); see also, *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1208-09 (9th Cir. 2003))

Under California law, "[f]oreseeability of harm should ordinarily be determined by a jury." (*Isaacs v. Huntington Memorial Hospital*, 38 Cal.3d 112, 135 (Cal. 1985))

Failure to follow a policy designed to protect from a specific occurrence has been held to establish proximate cause.  In *Bullis v. Security Pacific National Bank*, 21 Cal.3d 801 (Cal. 1978), the defendant bank was found to be the proximate cause of loss by failing to follow its procedure and the custom and practice in the banking industry of requiring two signatures.  In holding that there was no superseding cause precluding a finding of

proximate cause, the California Supreme

Court stated:

> While Lampe's intentionally tortious conduct caused the estate's loss, his actions cannot insulate appellant from liability for its negligent conduct.  A person is liable for any injury proximately or substantially caused by his negligent conduct, even if a third person's conduct directly precipitates the injury. (Citation) "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." ( Rest.2d Torts, § 449, other citations omitted)

> The risk that one co-executor would act alone and make unauthorized withdrawals was significant in establishing the standard of care. The deviation from this standard allowed that very risk to become a reality in this case. Therefore, the occurrence of this foreseeable act does not break the chain of legal causation which holds appellant liable for the estate's loss. (Citation)

> Appellant asserts that the imposition of liability would punish appellant for its failure "to control the conduct of another," i.e., Lampe. (Citation) This contention overlooks the fact that the trial court merely reaffirmed the obvious proposition that appellant owed a duty of due care to its depositors.  Appellant was held liable for the estate's loss because its conduct, in opening and maintaining the estate's account, did not meet the standard of reasonable care expected of a bank. Its negligent conduct resulted in a reasonably foreseeable injury. Thus, liability was based on appellant's own negligence, not on a breach of any duty

to control Lampe. (Citation) (*Bullis, supra*, at 812-13)

In *Avitia v. United States*, 24 Fed. Appx. 771, 2001 U.S. App. LEXIS 26806 (9th Cir. 2001), the Ninth Circuit addressed this issue in the context of a patient assaulted by her doctor that occurred in part due to the violation of a policy in a clinic that a chaperone be provided in a gynecological examination.  (*Id.* at 772-73) The United states made the same argument there that it makes here regarding proximate cause.  The Ninth Circuit disagreed:

> The United States' more forceful argument is that the clinic's (and its employee's) failure to follow the chaperone policy is not the proximate cause of Avitia's injuries because Shohayeb's assault on Avitia was a superseding cause.  A superseding cause is an intervening act that relieves a negligent actor of liability. (*Werkman v. Howard Zink Corp.*, 97 Cal. App. 2d 418, 218 P.2d 43, 47-48 (Cal. 1950)) An intervening act is a superseding cause if it is not foreseeable, or is highly unusual or extraordinary. (*Schrimscher v. Bryson*, 58 Cal. App. 3d 660, 130 Cal. Rptr. 125, 127 (Cal. Ct. App. 1976)) The chaperone policy at the clinic at the time the complained-of assault took place was put in place in part to ensure patient safety.  It is no stretch of imagination that such safety concerns would include the prevention of the kind of inappropriate conduct complained of here.  If the policy was put in place to prevent such conduct, the assault was foreseeable and

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Shohayeb's intentional conduct did not supersede the negligent acts of the clinic and Barbosa.
(*Id.* at 774-75; accord, *Sheridan v. United States*, 487 U.S. 392, 401-02 (1988))

Such is the case here.  As the Declaration of Joe McGrath makes clear,

11.  Operational policies, procedures and protocols designed to search, control and  provide accountability for prisoners, such as those employed at USP, are calculated to reduce the risk of attempted escapes, violent assaults and the introduction and trafficking of dangerous contraband and weapons within the prison complex.  There is a basic tenet of high security corrections universally held by practitioners in the field that holds that whenever security practices designed to control prisoner movement and accountability are breeched, the likelihood of prisoner escape attempts, violent assaults and the trafficking of dangerous contraband and weapons increases significantly.  These outcomes are predictable when prisoners are not accounted for and allowed to enter areas of the prison that are restricted to them.

It is equally clear that the prison had a clear and direct policy that inmates were not allowed in other housing units absent some special circumstances, not present here, and that all inmates entering the housing unit were to be screened through the metal detector.  (Exhibit C to Declaration of Anthony Boskovich, at pp. 9, 11, 23)

Defendant's insinuation regarding the source of the weapon at footnote 5 is nothing but a red herring.  Inmate Wiggins should not have been allowed to bypass the metal detector with or without a weapon, and defendant has not presented any evidence that any inmate should be allowed to have possession of a metal knife in a maximum security prison housing unit because that is, quite frankly, an absurd proposition.  But it is undisputed that the weapon and Wiggins were there and in combination they committed the brutal assault on plaintiff.  Therefore, the causal connection, as argued above, is clear.

Finally, defendant's protestations notwithstanding, inmate-on-inmate assaults with weapons were not a rare occurrence.  By the prison's own statistics, for fiscal years 2005 and 2006 the frequency of assaults with weapons was from 56 to 69 assaults per 5000 inmates, a rate significantly higher than the average for federal prisons at the same security level.  (See Exhibit B to Declaration of Anthony Boskovich)

Thus, under California and Federal law,

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

the attack on plaintiff was foreseeable because the defendant had clear policies and procedures designed to prevent the very act that occurred, and but for the failure of Officer Raygoza to follow those procedures the attack on plaintiff would not have occurred.  In sum, there is little question that the failure to follow established policies and procedures rendered the negligent conduct to be a proximate and legal cause of plaintiff's injuries.

| | |
|---|---|
| 12. Because the failure to prohibit Wiggins from entering Unit 6A is the only conceivable basis for finding a breach of duty,  Wiggins' attack on Grandy would have to have been a foreseeable consequence of that breach, and it was not.  The attack was a highly unusual incident, from the perspective of a reasonable prison official, since most inmates caught out-of-bounds did not commit assaults on other inmates.  The evidence is undisputed and undisputable that inmate-on-inmate violence attributable to inmates being out-of- | Defendant is once again incorrect.<br><br>In *Landeros v. Flood,*17 Cal.3d 399 (Cal. 1976), the court addressed those situations where criminal activity against a plaintiff follows the defendant's alleged negligence; that is, when an intervening act by a criminal constitutes the immediate cause in fact of the plaintiff's injuries for which the plaintiff seeks to recover against the defendant. The *Landeros* court said: "It is well settled in this state … an intervening act does not amount to a 'superseding cause' relieving the negligent defendant of liability … if it was reasonably foreseeable: '[A]n actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct.' [Citation] Moreover, under section 449 of the Restatement Second of Torts that foreseeability may arise directly from the risk created by the |

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

bounds was a rare occurrence at the Penitentiary.  (Grant Dec. ¶ 19)  It is also undisputed that no prison official knew prior to the incident that Grandy was at risk of attack by Wiggins or any other inmate.  (*Id.* ¶ 6)[5]

original act of negligence: 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.' (Italics added.) [Citation.]"
*Raven H. V. Gamette*, 157 Cal.App.4th 1017, 1030 (Cal.App. 2008); see also, *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1208-09 (9th Cir. 2003))

Under California law, "[f]oreseeability of harm should ordinarily be determined by a jury." (*Isaacs v. Huntington Memorial Hospital*, 38 Cal.3d 112, 135 (Cal. 1985))

Failure to follow a policy designed to protect from a specific occurrence has been held to establish proximate cause.  In *Bullis v. Security Pacific National Bank*, 21 Cal.3d 801 (Cal. 1978), the defendant bank was found to be the proximate cause of loss by failing to follow its procedure and the custom and practice in the banking industry of requiring two signatures.  In holding that there was no superseding cause precluding a finding of proximate cause, the California Supreme Court stated:

While Lampe's intentionally tortious conduct caused the estate's

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

loss, his actions cannot insulate appellant from liability for its negligent conduct.  A person is liable for any injury proximately or substantially caused by his negligent conduct, even if a third person's conduct directly precipitates the injury. (Citation) "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." ( Rest.2d Torts, § 449, other citations omitted)

The risk that one co-executor would act alone and make unauthorized withdrawals was significant in establishing the standard of care. The deviation from this standard allowed that very risk to become a reality in this case. Therefore, the occurrence of this foreseeable act does not break the chain of legal causation which holds appellant liable for the estate's loss. (Citation)

Appellant asserts that the imposition of liability would punish appellant for its failure "to control the conduct of another," i.e., Lampe. (Citation) This contention overlooks the fact that the trial court merely reaffirmed the obvious proposition that appellant owed a duty of due care to its depositors.  Appellant was held liable for the estate's loss because its conduct, in opening and maintaining the estate's account, did not meet the standard of reasonable care expected of a bank. Its negligent conduct resulted in a reasonably foreseeable injury. Thus, liability was based on appellant's own negligence, not on a breach of any duty to control Lampe. (Citation) (*Bullis*, *supra*, at 812-13)

In *Avitia v. United States*, 24 Fed. Appx. 771, 2001 U.S. App. LEXIS 26806 (9th Cir. 2001),

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

the Ninth Circuit addressed this issue in the context of a patient assaulted by her doctor that occurred in part due to the violation of a policy in a clinic that a chaperone be provided in a gynecological examination. (*Id.* at 772-73) The United states made the same argument there that it makes here regarding proximate cause. The Ninth Circuit disagreed:

> The United States' more forceful argument is that the clinic's (and its employee's) failure to follow the chaperone policy is not the proximate cause of Avitia's injuries because Shohayeb's assault on Avitia was a superseding cause. A superseding cause is an intervening act that relieves a negligent actor of liability. (*Werkman v. Howard Zink Corp.*, 97 Cal. App. 2d 418, 218 P.2d 43, 47-48 (Cal. 1950)) An intervening act is a superseding cause if it is not foreseeable, or is highly unusual or extraordinary. (*Schrimscher v. Bryson*, 58 Cal. App. 3d 660, 130 Cal. Rptr. 125, 127 (Cal. Ct. App. 1976)) The chaperone policy at the clinic at the time the complained-of assault took place was put in place in part to ensure patient safety. It is no stretch of imagination that such safety concerns would include the prevention of the kind of inappropriate conduct complained of here. If the policy was put in place to prevent such conduct, the assault was foreseeable and Shohayeb's intentional conduct did not supersede the negligent acts of the clinic and Barbosa.

(*Id.* at 774-75; accord, *Sheridan v. United States*, 487 U.S. 392, 401-02 (1988))

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Such is the case here.  As the Declaration of Joe McGrath makes clear,

> 11.  Operational policies, procedures and protocols designed to search, control and  provide accountability for prisoners, such as those employed at USP, are calculated to reduce the risk of attempted escapes, violent assaults and the introduction and trafficking of dangerous contraband and weapons within the prison complex.  There is a basic tenet of high security corrections universally held by practitioners in the field that holds that whenever security practices designed to control prisoner movement and accountability are breeched, the likelihood of prisoner escape attempts, violent assaults and the trafficking of dangerous contraband and weapons increases significantly.  These outcomes are predictable when prisoners are not accounted for and allowed to enter areas of the prison that are restricted to them.

It is equally clear that the prison had a clear and direct policy that inmates were not allowed in other housing units absent some special circumstances, not present here, and that all inmates entering the housing unit were to be screened through the metal detector.  (Exhibit C to Declaration of Anthony Boskovich, at pp. 9, 11, 23)

Defendant's insinuation regarding the source of the weapon at footnote 5 is nothing but a red herring.  Inmate Wiggins should not have been allowed to bypass the metal

detector with or without a weapon, and defendant has not presented any evidence that any inmate should be allowed to have possession of a metal knife in a maximum security prison housing unit because that is, quite frankly, an absurd proposition. But it is undisputed that the weapon and Wiggins were there and in combination they committed the brutal assault on plaintiff. Therefore, the causal connection, as argued above, is clear.

Finally, defendant's protestations notwithstanding, inmate-on-inmate assaults with weapons were not a rare occurrence. By the prison's own statistics, for fiscal years 2005 and 2006 the frequency of assaults with weapons was from 56 to 69 assaults per 5000 inmates, a rate significantly higher than the average for federal prisons at the same security level. See Exhibit B to Declaration of Anthony Boskovich)

Thus, under California and Federal law, the attack on plaintiff was foreseeable because the defendant had clear policies and procedures designed to prevent the very act that occurred, and but for the failure of

Officer Raygoza to follow those procedures the attack on plaintiff would not have occurred.  In sum, there is little question that the failure to follow established policies and procedures rendered the negligent conduct to be a proximate and legal cause of plaintiff's injuries.

1.  One month prior to the November 2006 assault on him,  Grandy was himself disciplined for possession of a homemade weapon.  (Grant Dec. ¶ 7)  Approximately two years after the attack on him, Grandy and three other inmates entered the cell of another inmate and assaulted him by stabbing him in the head.  (*Id.*)  The victim resided in a different housing unit, and Grandy and his fellow assailants traveled out-of-bounds in order to pull off the attack.  (*Id.*)  Several months later, Grandy was written up again for possession of a weapon.  (*Id.*)  Finally, on February 19, 2009, a staff member found Grandy scratching the word "CRIP" into a computer station in the Electronic Law Library.  (*Id.*)  Grandy admitted to the charge during a Unit Discipline Committee hearing on February 21, 2009.  (*Id.*)

2.  Officer Raygoza testified that, consistent with the policy prohibiting non-resident inmates from entering other housing units without authorization, inmates were not required to go to a "specific place" during an open move but could travel anywhere they wanted.  (Raygoza Depo. 40:20-42:6)  He further corroborated that inmates were "not supposed to" enter housing units in which they did not reside.  (Raygoza Depo. 41:18-42:6)  There is no evidence that non-resident inmates regularly or even occasionally entered Unit 6A under Officer Raygoza's watch *without* his knowledge or permission, without some other official authorization, or without going through the metal detector.  (*Id.* 69:6-9; Grant Dec. ¶ 24; Raygoza Depo. 113:9-15; 126:21-127:2)  Moreover, Officer Raygoza testified that he was fully aware that it violated policy for non-residents to remain in Unit 6A after an open move.  (Raygoza Depo. 68:9-15)

3.  Because Defendant is moving for summary judgment, Defendant has the initial burden of production on these central legal issues.  *See* Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  Defendant may carry its burden by either negating an essential element of Grandy's claim or by showing that Grandy does not have sufficient evidence of an essential element of his claim to carry his ultimate burden of persuasion at trial.  *See id.*

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

4.     Similarly, Ashfield's statement that "[n]obody really goes through it if they don't have to," (Ashfield Depo. 20:14-20; 21:6-13) -- far from proving what it suggests, *i.e.*, that Officer Raygoza did not require inmates to pass through the metal detector -- actually tends to show that inmates routinely went through the metal detector because it was a requirement.  His subsequent testimony about Officer Raygoza's practice of requiring inmates who triggered the metal detector to go back through it supports this interpretation.  Moreover, if Officer Raygoza routinely let inmates bypass the metal detector, this witness presumably would have said so outright, rather than hint at it.  In any event, because this testimony is impermissibly vague and constitutes inadmissible lay opinion, it should be stricken.  *See* Fed.R.Evid. 602 & 701.

5.     The assault could only be considered arguably foreseeable if Wiggins either (1) passed through the metal detector with the weapons on his person, and the metal detector alerted without any response from Officer Raygoza, or (2) went around the metal detector with weapons on his person while Officer Raygoza was watching.  There is no admissible evidence in the record supporting either scenario.

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

**PLAINTIFF'S MATERIAL FACTS AND SUPPORTING EVIDENCE**

1.  Mr. Grandy was not seen to do anything to provoke the attack and was not seen in possession of a weapon during it.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of Ray Raygoza, pp.  73-82)

2.  Mr. Raygoza understood that the policy of the Victorville USP to permit inmates from other housing units onto housing unit 6A as long as they were searched prior to entering the unit.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of Ray Raygoza, pp.  40-43)

3.  In fact, this was not the policy. The policy is and was, that inmates are not allowed on to other inmates' housing units unless they are part of a work crew.  (Exhibit C to Declaration of Anthony Boskovich, Post Orders for USP - Victorville;  Exhibit J to Declaration of Anthony Boskovich, Inmate Manual, p. 7, rule 3;   Exhibit F to Declaration of Anthony Boskovich, Interrogatory responses, Interrogatory 14; Exhibit I to Declaration of Anthony Boskovich, Deposition of Russell Allison, pp. 28-29)

4.  In his deposition, Raygoza  admitted that he did not remember what procedures were in place to ensure that only inmates housed in 6A were allowed on the unit.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of Ray Raygoza, pp.  89-90)

5.  There was only one entrance in use for inmates to housing unit 6A on November 25, 2006.  (Exhibit K to Declaration of Anthony Boskovich, Deposition of Brett Jorgensen, pp 7-8)

6.  In order to get onto the unit inmates were required to pass through a standing metal detector.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of Ray Raygoza, p. 55;

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

1 | Exhibit K to Declaration of Anthony Boskovich, Deposition of Brett Jorgensen, p. 10)

2

3      7.  Wiggins walked around the metal detector and entered the unit. Raygoza did not monitor

4 Wiggins as he passed into the sallyport area where the metal detector was located.  (Exhibit H to

5 Declaration of Anthony Boskovich, Deposition of Woodie Mack Ashfield, pp. 12-22; Declaration

6 of Horatio Demarious Smith)

7

8      8.  Wiggins entered the Unit 6A unit no later that 12:00 Noon because at this time the door

9 to the unit was secured and according to Raygoza, stayed that way until Grandy was attacked at

10 12:44 pm. Hence, Wiggins stayed on the unit for a minimum of about three quarters of an hour,

11 without being detected by Mr. Raygoza.  (Exhibit G to Declaration of Anthony Boskovich,

12 Deposition of Ray Raygoza, pp. 112-13)

13

14      9.  Officer Raygoza had the responsibility to make sure that an unauthorized person did not

15 enter housing unit 6A.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of Ray

16 Raygoza, p. 87)

17

18      10.  It was Officer Raygoza' s responsibility to make sure that persons entering the unit

19 passed through the metal detector.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of

20 Ray Raygoza, p. 87)

21

22      11.  Officer Raygoza  did nothing to ensure only 6A residents remained on unit after the

23 front door was secured.  (Exhibit G to Declaration of Anthony Boskovich, Deposition of Ray

24 Raygoza, p. 69)

25

26      12.  Officer Raygoza did not know inmate Wiggins prior to the attack.  (Exhibit G to

27

28

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150

1 | Declaration of Anthony Boskovich, Deposition of Ray Raygoza, p. 44)

2

3 |     13.  There was a picture board on the unit, on the day of the incident,  through which all

4 | inmates actually housed on the unit could be identified.  (Exhibit G to Declaration of Anthony

5 | Boskovich, Deposition of Ray Raygoza, p. 89)

6

7 |     14.  Moreover, the United States admits that the weapons that were recovered after the

8 | attack were metal and would have set off the metal detector had someone passed through it with

9 | those weapons.  (Exhibit E to Declaration of Anthony Boskovich, Responses to Requests for

10 | Admissions, Request 12)

11

12 |     15.  The U.S. also admitted that the metal detector was working normally on November 25,

13 | 2006.  (Exhibit E to Declaration of Anthony Boskovich, Responses to Requests for Admissions,

14 | Request 8)

15

16 |     16.  Plaintiff's prison expert, Joseph McGrath opines that Officer Raygoza violated the

17 | applicable national  standard of care with respect to this incident and that those violations were the

18 | proximate cause of Mr. Grandy's injury.  (Declaration of Joe McGrath)

19

20 |     17.  Assault data from Victorville, USP shows a significant history of  armed inmate on

21 | inmate assaults.  (Exhibit B to Declaration of Anthony Boskovich, Assault Reports)

22 | //

23 | //

24 | //

25 | //

26 | //

27

28 | Statement of Genuine Issues in
Opposition to Motion for Summary Judgment                                        Page 53

18.  Defendant has produced no evidence, including its expert opinions, that Officer Ray Raygoza's conduct met the applicable standard of care.

Dated: 20 June 2010

/s/ Anthony Boskovich

_____
Anthony Boskovich
Attorney for plaintiff

/s/ Geoffrey Allen

_____
Geoffrey Allen
Attorney for plaintiff

Law Offices of Anthony Boskovich 28 North First Street, 6th Floor, San Jose, CA 95113  (408) 286-5150