ANDRÉ BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
SEKRET T. SNEED (SBN 217193)
DONALD W. YOO (SBN 227679)
Assistant United States Attorneys
     Room 7516, Federal Building
     300 North Los Angeles Street
     Los Angeles, California 90012
     Tel:       (213) 894-3531/3994
     Fax:     (213) 894-7819
     Email:    sekret.sneed@usdoj.gov
              donald.yoo@usdoj.gov

Attorneys for Defendant
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES GRANDY, an individual,<br><br>       Plaintiff,<br><br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>       Defendant. | No. CV09-01270-JHN (RZx)<br><br>**DEFENDANT UNITED STATES'**<br>**TRIAL MEMORANDUM**<br><br>[C.D. Local Rule 16-10]<br><br>Trial Date:  February 15, 2011<br>Time:       9:00 a.m.<br>Ctrm:      Roybal Federal Building<br>            255 East Temple Street<br>            Courtroom 790<br>            Los Angeles, CA 90012<br><br>Honorable Jacqueline H. Nguyen |

# TABLE OF CONTENTS

I.   ANTICIPATED EVIDENCE AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Defendant's Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1.   Correctional Officer Ricardo Raygoza . . . . . . . . . . . . . . . . . . . . 1

        2.   Shawn Grant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        3.   Masoud Shojaei . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        4.   Arthur Kowell, M.D., Ph.D . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   Documentary Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.   USP Victorville Special Orders - Post: General Housing Units . 3

        2.   Photographs of Unit 6A Sallyport . . . . . . . . . . . . . . . . . . . . . . 4

        3.   Plaintiff's Work Performance Evaluations . . . . . . . . . . . . . . . . 4

        4.   Plaintiff's Education Course Completion Certificates . . . . . . . . 4

        5.   Plaintiff's BOP Medical Records . . . . . . . . . . . . . . . . . . . . . . 4

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.   THE COURT LACKS SUBJECT MATTER JURISDICTION
       OVER THIS ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.   The Federal Tort Claims Act. . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.   Discretionary Function Exception. . . . . . . . . . . . . . . . . . . . . . . 5

        3.   Officer Raygoza's Conduct Falls Within the
           Discretionary Function Exception. . . . . . . . . . . . . . . . . . . . . . . 7

           a.   Officer Raygoza's Conduct was Discretionary. . . . . . . . . 7

           b.   The Challenged Decisions Involved Public Policy
              Considerations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.   PLAINTIFF CANNOT ESTABLISH THAT OFFICER RAYGOZA
       WAS NEGLIGENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   The United States Cannot Be Held Strictly Liable Under
           the FTCA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.   The Standard of Care Owed to Plaintiff Is That of Ordinary
           Diligence Under the Circumstances. . . . . . . . . . . . . . . . . . . . 11

        3.   Officer Raygoza Exercised Ordinary Care in the
           Performance of His Duties. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

-i-

C.     PLAINTIFF'S DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

         1.    Plaintiff Is Only Entitled to Pain and Suffering Damages. . . . .  13

         2.    Plaintiff is Only Entitled to a *De Minimus* Award of Damages.  14

# TABLE OF AUTHORITIES

## **FEDERAL CASES**

Alfrey v. United States,
    276 F.3d 557 (9th Cir. 2002) ........................................................ 5, 6, 10

Berkovitz v. United States,
    486 U.S. 531 (1988) ................................................................... 9

Bibeau v. Pac. Northwest Research Foundation, Inc.,
    339 F.3d 942 (9th Cir. 2003) ...................................................... 5

Bramer v. United States,
    595 F.2d 1141 (9th Cir. 1979) .................................................. 10

Calderon v. United States,
    123 F.3d 947 (7th Cir. 1997) .................................................. 7, 8, 10, 11

Dalehite v. United States,
    346 U.S. 15 (1953) .................................................................. 6

Dykstra v. U.S. Bureau of Prisons,
    140 F.3d 791 (8th Cir. 1998) .................................................... 9

Feeley v. United States,
    337 F.2d 924 (3d Cir.1964) ...................................................... 13

Jackson v. United  States,
    413 F. Supp. 516 (D. Ohio 1976) ............................................ 11

Johnson v. United States,
    258 F. Supp. 372 (E.D. Va. 1966) .......................................... 11

Jones v. United States,
    534 F.2d 53 (5th Cir. 1976) ..................................................... 11

Laird v. Nelms,
    406 U.S. 797 (1972) .............................................................. 10

Miller v. United States,
    163 F.3d 591 (9th Cir. 1998) .................................................... 8

Mitchell v. United States,
    149 F. Supp. 2d 1111 (D. Ariz. 1999) ................................... 6, 10

Navarette v. United States,
    500 F.3d 914 (9th Cir. 2007) .................................................... 8

Sigman v. United States,
    217 F.3d 785 (9th Cir. 2000) .................................................... 6

-iii-

Ting v. United States,
        927 F.2d 1504 (9th Cir. 1991) ................................................................ 11

United States v. Gaubert,
        499 U.S. 315 (1991) ......................................................................... 6, 7, 9

Williams v. United States,
        384 F. Supp. 579 (D.C.D.C. 1974) ................................................. 11, 12

## **FEDERAL STATUTES**

18 U.S.C. § 4042 ................................................................................... 7, 11

28 U.S.C. § 1346(b) .............................................................................. 5, 11

28 U.S.C. § 2680(a) ................................................................................... 5

28 U.S.C. § 2674 ................................................................................... 5, 13

The United States respectfully submits this Trial Memorandum for the assistance of the Court. This Memorandum sets forth a discussion of the applicable substantive law and an overview of Defendant's anticipated evidence at trial.

## I.   ANTICIPATED EVIDENCE AT TRIAL

**A.   Defendant's Witnesses**

1.   Correctional Officer Ricardo Raygoza

Officer Raygoza will testify that he was the only officer assigned to housing unit 6A at the time of the assault on November 25, 2006. Officer Raygoza will testify that there were over 100 inmates assigned to Unit 6A on that day. Further, at approximately noon on November 25, 2006, there was an open move where inmates returned to Unit 6A from lunch.

Officer Raygoza will testify that during an open move, inmates are required to enter through a sallyport that is monitored by one housing unit officer. A sallyport is a secure, controlled entryway comprised of an exterior door and an interior door. In between the exterior and interior doors is a standing metal detector.

During an open move, housing unit officers must juggle a multitude of tasks including, but not limited to, monitoring the sallyport to ensure that inmates clear the metal detector before entering or exiting the housing unit, observing the line of inmates waiting outside to enter the housing unit to prevent, among other things, the passing of contraband and to prevent non-resident inmates from entering the unit, monitoring the inmates already inside the housing unit, and conducting a "pat search" of any inmate who triggers the metal detector. In order to accomplish these responsibilities, Officer Raygoza relies upon his experience and the custom and practice of other BOP housing unit officers to position himself in different areas inside and outside the sallyport. This serves to both mitigate against the predictability of his movements as well as to best position himself to monitor the inmates from a variety of angles.

Officer Raygoza will testify that to the best of his ability, he attempted to ensure

that each inmate who passed in front of him resided in Unit 6A and passed through the metal detector prior to entering the unit.  Officer Raygoza will further testify that he did not intentionally allow Wiggins into the unit nor did he know that Wiggins was out-of-bounds before the attack occurred.

2.   Shawn Grant

Shawn Grant was the Captain at USP Victorville at the time of the assault. Currently, Mr. Grant is the Administrative Unit Administrator at the Federal Medical Center at Carswell, Texas.  Mr. Grant will testify that no one at USP Victorville was aware of any risk that Plaintiff would be assaulted by Wiggins.  Mr. Grant will further testify that USP Victorville is a maximum security correctional facility and that decisions regarding how to monitor and supervise inmates, including where officers position themselves while monitoring inmates, are governed by both the mission of the BOP and resource constraints.

Mr. Grant will testify that taking into account its mission and resource limitations, the BOP chose to implement its duty to safeguard inmates at USP Victorville by installing walk-through metal detectors at the entrance of each housing unit[1] and by allowing each housing unit officer to position himself in a manner, which in his/her judgment, best allows him/her to effectuate that duty.  In particular, Mr. Grant will testify that housing unit officers have multiple responsibilities during an open move, including monitoring the sallyport to ensure that inmates clear the metal detector before entering or exiting the housing unit, observing the line of inmates waiting outside to enter the housing unit to prevent, among other things, the passing of contraband and to prevent non-resident inmates from entering the unit, monitoring the

---

[1]   Mr. Grant will testify that the BOP chose to install walk-through metal detectors because, given the short-handed staff, it is more time-efficient and safer for the officer and the inmates, for each inmate to pass through a metal detector, rather than for the single housing unit officer to attempt the impossible task of patting down, or running a handheld wand over, every one of the over 100 inmates seeking to enter the housing unit several times per day.  Accordingly, the walk-through metal detector is able to detect more metal weapons than a pat-down or a search with a handheld wand could.

inmates already inside the housing unit, and conducting a "pat search" of any inmate who triggers the metal detector.

### 3.   Masoud Shojaei

Mr. Shojaei is a physician's assistant who treated Plaintiff immediately following the assault on November 25, 2006.  Mr. Shoejai is also the medical staff member who primarily evaluates and treats Plaintiff at USP Victorville.  Mr. Shojaei will testify, among other things, that Plaintiff is not currently suffering from, or ever suffered from any emotional or mental distress since the assault.  Mr. Shojaei will also testify that Plaintiff has not complained of being in pain as a result of his injury and that the primary medical condition he is currently being treated for is hypertension. Mr. Shojaei will further testify that Plaintiff is not receiving any active treatment or taking any prescription medications for his injuries.

### 4.   Arthur Kowell, M.D., Ph.D

Dr. Kowell is Defendant's expert medical witness.  Unlike Dr. Herbert Joseph, Plaintiff's expert witness, Dr. Kowell conducted an independent medical examination on Plaintiff.  Dr. Kowell will testify that as a result of the attack, Plaintiff currently suffers from partial Brown-Sequard Syndrome at the C5-C6 cervical vertebrae level. Partial Brown-Sequard Syndrome is characterized by a partial injury to the spinal cord that results in some motor damage to one side of the body and some partial sensory loss on the opposite side of the body.  This has resulted in Plaintiff experiencing some weakness in the left side of his body and intermittent numbness on the right side of his body.  Dr. Kowell will further testify that Plaintiff does not require any further evaluation or treatment for the injuries he alleges he sustained.  Plaintiff's injury will not result in any decreased life expectancy nor will his current neurological condition further deteriorate.  Dr. Kowell will also discuss the findings of his independent medical examination.

## B.   Documentary Evidence

### 1.   USP Victorville Special Orders - Post: General Housing Units

The Special Orders set forth a housing unit officer's responsibilities.  Absent from the Special Orders are any mandatory policies regarding procedures for housing unit officers to follow to prevent inmates from entering their non-assigned housing units and to monitor the walk-through metal detectors during an "open move."

2.      Photographs of Unit 6A Sallyport

Defendant will utilize pictures and a diagram of the Unit 6A sallyport in order to demonstrate the design of the sallyport and the location of metal detector in relation to the interior and exterior doors of the housing unit.

3.      Plaintiff's Work Performance Evaluations

Documentary evidence will demonstrate that Plaintiff is physically capable of performing the same activities as before the assault.  Specifically, prior to the assault, Plaintiff was employed as an orderly in Unit 6A.  After the assault, Plaintiff returned to work as an orderly, albeit in a different housing unit.  Plaintiff was eventually promoted to the position of head orderly.  Plaintiff has received several work performance evaluations since the assault, most of which resulted in him receiving "good" or "outstanding" ratings for his work performance.  In addition, Plaintiff has been recommended for bonus pay as a result of his work.

4.      Plaintiff's Education Course Completion Certificates

Since the assault, Plaintiff has successfully completed a 35-hour computer typing course and a 150-hour computer training course (Microsoft Office) at USP Victorville.

5.      Plaintiff's BOP Medical Records

Plaintiff's BOP medical records will demonstrate that Plaintiff is not receiving any active treatment or taking any prescription medications for his injuries.  Those medical records will also demonstrate that Plaintiff does not require any further evaluation or treatment for the injuries he alleges he sustained.

/ / /

/ / /

4

/ / /

## II.    ARGUMENT

**A.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS ACTION.**

### 1.    The Federal Tort Claims Act.

The Federal Tort Claims Act ("FTCA") is a limited waiver of sovereign immunity for certain torts committed by federal employees while acting within the scope of their employment.  28 U.S.C. § 1346(b)(1).  In those cases, the United States is held liable "in the same manner and to the same extent as a private individual under like circumstances. . . ." 28 U.S.C. § 2674.

In the instant matter, Plaintiff brings suit under the FTCA for damages allegedly sustained following an assault by another inmate while in federal custody. Specifically, Plaintiff asserts that Correctional Officer Ricardo Raygoza ("Officer Raygoza") breached the standard of care while monitoring inmates entering his housing unit during an open move.  Plaintiff claims that Officer Raygoza's breach of the standard of care allowed Wiggins, an "out of bounds" inmate, to enter Unit 6A and attack Plaintiff with a metal knife.

### 2.    Discretionary Function Exception.

The discretionary function exception to the FTCA immunizes the federal government from suit for "[a]ny claim. . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  If the discretionary function exception applies to a particular claim, the court lacks subject matter jurisdiction over that claim and it must be dismissed.  *Bibeau v. Pac. Nw. Research Found., Inc.*, 339 F.3d 942, 945 (9th Cir. 2003).

There is a two-step analysis in deciding whether this exception applies.  *Alfrey*

*v. United States*, 276 F.3d 557, 561 (9th Cir. 2002).  First, a court must decide whether the relevant government actor had any discretion at all.  *See id.*  More specifically, the court must determine whether a "federal statute, regulation, or policy specifically prescribes a course of action" as to the decision at issue.  *Id.*  If the course of action is not specifically prescribed by statute, regulation, or policy, then the conduct likely involves an element of judgment or choice, and the second inquiry is appropriate.  *See United States v. Gaubert*, 499 U.S. 315, 322 (1991).

The second inquiry is then whether the judgment or choice is of the "kind that the discretionary function exception was designed to shield."  *Id.* at 322-23.  In particular, the court must determine whether the judgment at issue involves "considerations of social, economic, and political policy."  *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000).

Two additional principles frame the inquiry at this stage.  First, the test is an objective one:  it looks to whether the relevant judgment is susceptible to policy analysis, not to whether the decision-maker consciously weighed various policy considerations.  *United States v. Gaubert*, 499 U.S. at 325.  Second, "[d]iscretionary conduct is not confined to the policy or planning level."  *Id.*  Rather, day-to-day, "operational" decision-making also frequently requires policy judgment and, in those cases, is protected as well.  *See id.*

Finally, even if the BOP was negligent in the performance of its discretion, the judgment and choices that flow from that discretion, including the choice of how to monitor inmates passing through the metal detector and how to monitor inmates during an "open move," fall under the discretionary function exception.  *See Mitchell v. United States*, 149 F. Supp. 2d 1111, 1115 (D. Ariz. 1999) ("[T]he discretionary function exception to the FTCA protects [the United States] from suit, even if Defendant abused its discretion or was negligent in the performance of its discretionary function"); *see also Dalehite v. United States*, 346 U.S. 15, 33 (1953) (the discretionary function exception contemplates "both negligent and wrongful acts

in the exercise of discretion.").

**3.      Officer Raygoza's Conduct Falls Within the Discretionary Function Exception.**

a.      <u>Officer Raygoza's Conduct was Discretionary.</u>

The Supreme Court defines a "discretionary act" as an act that involves an element of judgment or choice. *United States v. Gaubert*, 499 U.S. at 322. As mentioned above, the element of judgment or choice is not satisfied if a statute, regulation, or policy specifically prescribes a course of action for an employee to follow because the employee has no rightful option but to follow the directive. *See id.* Here, the "discretionary act" at issue are Officer Raygoza's decisions on how and where he positioned himself to monitor inmates during an open move in order prevent out-of-bounds inmates from entering the unit and to ensure that all inmates cleared the metal detector.

Although the BOP has the nondelegable duty to "provide for the safekeeping" of inmates, 18 U.S.C. § 4042, this statute "sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997); *see also Doe v. United States*, No. CV08-00517, 2010 WL 1904976, at *5 (D. Hawai'i May 10, 2010) ("While 18 U.S.C. § 4042 requires the BOP to 'provide for the safekeeping, care. . . [and] protection' of inmates, this statute sets forth no particular conduct in which the BOP must engage"). As such, USP Victorville has promulgated "Special Orders" which outline the housing unit officer's responsibilities during his shift.

At issue here are two sections of the Special Orders which Plaintiff alleges were not followed. First, Plaintiff asserts that Special Orders prohibit inmates from visiting other housing units without authorization. Second, Plaintiff asserts that the Special Orders require that each inmate clear the metal detector when entering or exiting the housing unit. Neither policy, however, proscribes specifically how the

7

housing unit officer is required to do so.

During an open move, housing unit officers are tasked with a multitude of responsibilities, which include making sure that inmates clear the metal detector when entering the housing unit as well as observing those inmates waiting to enter the housing unit from the outside.  The housing unit officer must also monitor the inmates already inside the housing unit.  Should an inmate trigger the metal detector as he passes through it, the housing unit officer must also conduct a "pat search" of that inmate.  No federal statute, regulation, or BOP policy proscribes how a housing unit officer is to accomplish these multiple tasks and responsibilities.  To the contrary, the evidence will show that housing unit officers exercise their discretion and vary their positions both inside and outside of the sallyport in order to both mitigate against predictability of their movements as well as to best position themselves to observe the inmates inside and outside from different angles.  Such discretion clearly involves an element of judgment or choice on the part of the housing unit officer.

The case *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998), is instructive.  There, the plaintiff sued the U.S. Forest Service under the FTCA for its allegedly negligent handling of a forest fire that spread from a national forest onto the plaintiff's property.  *See id.* at 592.  The Ninth Circuit held the first prong of the discretionary function exception had been met because there were "no specific directives that mandate[d] *specific action* in a multiple fire situation."  *Id.* at 595 (emphasis added).  Although there were general firefighting guidelines, those guidelines "[did] not eliminate discretion because they. . . did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time."  *Id.*; *see also Navarette v. United States*, 500 F.3d 914, 916 (9th Cir. 2007) (an agency retains discretion whether to act where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) (finding the challenged decision discretionary where no statute, regulation or policy "set forth a mandatory, non-discretionary disciplinary action

8

1  which the BOP was required to take against [the assailant] prior to his attack on [the

2  plaintiff]").

3        Likewise here, no statute, regulation, or policy dictated precisely how Officer

4  Raygoza was to monitor the sallyport during an open move.  To be sure, there is no

5  mandatory or specific directive regarding *how* Officer Raygoza is required to ensure

6  inmates do so.  Rather, that determination is left entirely to Officer Raygoza's

7  discretion.  Indeed, the evidence at trial will show that Officer Raygoza's goal was

8  ensure that every inmate cleared the metal detector when entering the housing unit but

9  that he had to balance that task with his other correctional responsibilities, such as

10 monitoring the others inmates waiting outside as well as monitoring those inmates

11 already inside the unit.

12        b.    The Challenged Decisions Involved Public Policy Considerations.

13       Because Officer Raygoza's challenged acts involved discretion, the Court must

14 next determine whether the judgment exercised was of the type that the discretionary

15 function exception seeks to protect.  *Berkovitz v. United States*, 486 U.S. 531, 536

16 (1988).  When making such a determination, the Court should start from the premise

17 that "[w]hen established governmental policy, as expressed or implied by statute,

18 regulation, or agency guidelines, allows a Government agent to exercise discretion, it

19 must be presumed that the agent's acts are grounded in policy when exercising that

20 discretion."  *United States v. Gaubert*, 499 U.S. at 324.  Even without this

21 presumption, however, the Court should nevertheless conclude that the nature of the

22 actions taken by Officer Raygoza involved considerations which were, at the very

23 least, "susceptible to policy analysis."

24       Under this second prong, courts have consistently held that the manner in which

25 the BOP supervises inmates involves the types of decisions that the discretionary

26 function exception was designed to shield – *i.e.*, decisions are based upon the need to

27 safeguard inmates, preserve internal order, and maintain institutional security.  *See,*

28 *e.g.*, *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998) ("[p]rison

9

1  officials supervise inmates based upon security levels, available resources,

2  classification of inmates, and other factors[,]" which "are inherently grounded in

3  social, political, and economic policy"); *Calderon v. United States*, 123 F.3d 947, 951

4  (7th Cir. 1997) (holding that "balancing the need to provide inmate security with the

5  rights of the inmates to circulate and socialize within the prison involves

6  considerations based upon public policy"); *Mitchell v. United States*, 149 F.Supp.2d

7  1111, 1114 (D.Ariz. 1999) ("[d]ecisions by governmental officials as to the

8  day-to-day security needs of a prison, including the number of guards to employ to

9  supervise a given area . . . are judgment calls and choices based on policy

10 determinations that seek to accommodate safety [goals] and the reality of finite agency

11 resources.").

12      Here, because Officer Raygoza's discretion in where and how to monitor the

13 inmates during an open move involved the supervision and protection of inmates, such

14 discretion necessarily involves considerations based upon public policy.  *See  Alfrey v.*

15 *United States*, 276 F.3d 557, 565 (9th Cir.2002) ("balancing the need to provide

16 inmate security with the rights of inmates to circulate and socialize within the prison

17 involves considerations based upon public policy").

18 **B.    PLAINTIFF CANNOT ESTABLISH THAT OFFICER RAYGOZA WAS**

19      **NEGLIGENT.**

20      Even assuming the Court were to find that the discretionary function exception

21 to the FTCA does not bar Plaintiff's claim, Plaintiff will nevertheless be unable to

22 establish that Officer Raygoza was negligent in the performance of his duties.

23      **1.    The United States Cannot Be Held Strictly Liable Under the FTCA.**

24      Plaintiff appears to assert that because Wiggins managed to enter Unit 6A and

25 attack Plaintiff with two metal knives, Officer Raygoza was negligent in the

26 performance of his duties.  Such an argument, however, would be based on strict

27 liability, which is not a claim that can be made under the FTCA.  *See Laird v. Nelms*,

28 406 U.S. 797, 804 (1972); *see also Bramer v. United States*, 595 F.2d 1141, 1144 n. 7

10

(9th Cir. 1979) (the FTCA's waiver of sovereign immunity does not include claims grounded in strict liability).  Indeed, federal courts have repeatedly held that negligence cannot be established by mere proof that the plaintiff was assaulted by a fellow inmate.  *See, e.g., Johnson v. United States*, 258 F.Supp. 372, 377 (E.D. Va. 1966) ("To say that [plaintiff] is entitled to recover solely because he was assaulted by [another inmate] . . . would make the United States an insurer of his safety.  Such is not the law."); *Williams v. United States*, 384 F.Supp. 579, 583 (D.C.D.C. 1974) ("plaintiff is required to demonstrate by a preponderance of the evidence that certain negligent acts have taken place and as a result, he was injured. . . [n]egligence cannot be inferred from the event itself.").

Here, Plaintiff has the burden of articulating the standard of care Officer Raygoza was required to exercise and demonstrate that Officer Raygoza's action, in fact, fell below that standard of care.  *See Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991).

> **2.      The Standard of Care Owed to Plaintiff Is That of Ordinary Diligence Under the Circumstances.**

When courts impose a duty on a defendant, they do so without a rigid, specific, and inflexible course of conduct.  *See Kentucky Fried Chicken of Cal., Inc. v. Superior Court*, 14 Cal.4th 814, 839 (1997).  Instead, the general standard of care for tort liability is that of a reasonably prudent person under like circumstances.  *See id.* Here, it is undisputed that the BOP has the statutory duty to "provide for the safekeeping" of inmates.  18 U.S.C. § 4042.  As noted above, however, § 4042 "sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."  *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997).  Instead, under the FTCA, the government is liable only to the extent a private party would be liable under similar circumstances.  28 U.S.C. § 1346(b).  It is well-established that the United States, through the Bureau of Prisons, is required to exercise ordinary diligence to keep prisoners safe and free from harm.

*See Jones v. United States*, 534 F.2d 53, 54 (5th Cir. 1976); *Jackson v. United States*, 413 F.Supp. 516, 519 (D. Ohio 1976) (BOP has duty to exercise ordinary care).  To be sure, the United States' duty to provide protection for federal prisoners is not absolute but requires the exercise of ordinary diligence under the circumstances.  *See Williams v. United States*, 384 F.Supp. 579, 583 (D.C.D.C. 1974); *see also* Restatement 2d, Torts § 283 ("the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances.").

> **3.** **Officer Raygoza Exercised Ordinary Care in the Performance of His Duties.**

The evidence will demonstrate that notwithstanding Wiggins' presence in Unit 6A, Officer Raygoza exercised ordinary care while monitoring inmates during the open move on November 25, 2006.  As discussed above, during an open move, housing unit officers are responsible for a multitude of tasks including, but not limited to, monitoring the sallyport to ensure that inmates clear the metal detector before entering or exiting the housing unit, observing the line of inmates waiting outside to enter the housing unit, monitoring the inmates already inside the housing unit, and conducting a "pat search" of any inmate who triggers the metal detector.  In order to accomplish these responsibilities, housing unit officers use their discretion to vary their positions both inside and outside the sallyport.

Here, it is undisputed that Officer Raygoza was the only officer assigned to Unit 6A on the day of the assault.  The evidence will show that it was Officer Raygoza's custom and practice, as was every other housing unit officer at USP Victorville, to observe inmates from varying positions during an open move – both inside and outside the sallyport – in order to mitigate against predictability and to be in the best position to observe the inmates entering the housing unit and those already inside the housing unit.  To the best of his ability, Officer Raygoza attempted to ensure that each inmate who passed in front of him resided in Unit 6A and cleared the metal detector prior to entering the unit.

With respect to Plaintiff's allegation that Officer Raygoza failed to identify and stop Wiggins from entering the housing unit, the evidence will show that Officer Raygoza did not intentionally allow Wiggins into the unit nor did he know that Wiggins was out-of-bounds before the attack occurred.  Further, the custom and practice of housing unit officers at the USP Victorville is not to use picture books to identify inmates during an open move.

**C.   PLAINTIFF'S DAMAGES.**

> **1.   Plaintiff Is Only Entitled to Pain and Suffering Damages.**

Even assuming *arguendo that* Plaintiff could overcome the discretionary function exception to the FTCA and establish that Officer Raygoza was negligent in the performance of his duties, Plaintiff is nonetheless only entitled to recover pain and suffering damages in this action.

Generally, in a personal injury action, a plaintiff is entitled to recover the following general and special damages: (1) past and future medical expenses; (2) lost earnings; (3) loss of earning capacity; (4) property damage; and (5) pain and suffering.[2]  *See Renfroe v. United States*, CV04-1955, 2005 WL 5887178, *7 (C.D. Cal. July 6, 2005) (citing Cal. Civ. Code § 3333); *see also Hilliard v. A.H. Robins Co.*, 148 Cal.App.3d 374, 412 (1983) (discussing damages available to plaintiff for personal injury).

In this case, it is undisputed that Plaintiff is serving a life sentence in federal custody, without the possibility of parole.  As such, the BOP has provided, and continues to provide all of Plaintiff's medical care since the assault.  Accordingly, Plaintiff is not entitled to recover past or future medical expenses.  *See, e.g.*, *Feeley v. United States*, 337 F.2d 924, 933-34 (3d Cir.1964) (plaintiff not entitled to recover medical expenses where all medical treatment was provided by the United States at no cost to plaintiff).

---

[2]   The FTCA prohibits the recovery of punitive damages against the United States. 28 U.S.C. § 2674.

Furthermore, Plaintiff returned to work as an orderly shortly after the assault. Thus, any lost earnings Plaintiff could recover would be *de minimus*.  Indeed, Plaintiff was earning approximately $0.12 per hour while employed as an orderly in Unit 6A and missed, at most, only a few weeks of work.  Additionally, as Plaintiff is currently employed as a head orderly, he is not entitled to recover damages for lost earning capacity.  Accordingly, the only category of damages Plaintiff would be entitled to recover would be pain and suffering damages.

## 2.     Plaintiff is Only Entitled to a *De Minimus* Award of Damages.

California law entitles a negligently injured person to pain and suffering damages in order to compensate for any pain, discomfort, feats, anxiety and other mental and emotional distress, as well as the loss of the capacity to enjoy life.  *See Capelouto v. Kaiser Found. Hosp.*, 7 Cal.3d 889, 892-93 (1972). There is no fixed standard for determining pain and suffering damages under California law; rather, the trier of fact is required to determine the amount of damages that are just and reasonable in light of the evidence.  *See id.*

Here, there is no evidence that Plaintiff's injuries will result in a decreased life expectancy.  There is no evidence that Plaintiff's current neurological condition will further deteriorate nor is there any evidence that Plaintiff currently suffers from, or ever suffered any emotional or mental distress since the assault.  There is no evidence of any impaired memory, cognitive dysfunction, or personality change and Plaintiff is not receiving any active treatment or taking any prescription medications for his injuries.  Additionally, Plaintiff does not require any further evaluation or treatment for the injuries he alleges he sustained.

To the contrary, it appears that Plaintiff remains physically active and capable of performing the same activities as before the assault.  Specifically, Plaintiff successfully completed a 35-hour computer typing course and a 150-hour computer training course (Microsoft Office) at USP Victorville.  Moreover, since the attack, Plaintiff was promoted to the position of head orderly for his housing unit.  That

14

position entails lifting and moving heavy boxes, loading and unloading cleaning supplies, and distributing toiletries and chemicals throughout the unit.  In addition, Plaintiff commonly performs other orderly duties, including mopping and cleaning, as needed.   Plaintiff's work ethic and diligence has resulted in him receiving "good" or "outstanding" ratings in his work performance evaluations and recommendations that Plaintiff receive bonus pay as a result of his work.

Based upon the above, Plaintiff's injuries support only a *de minimus* award of damages.

Respectfully submitted,

Dated:   February 8, 2011

ANDRÉ BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division

*/s/ Donald W. Yoo*
_____
DONALD W. YOO
SEKRET T. SNEED
Assistant United States Attorneys

Attorneys for Defendant
UNITED STATES OF AMERICA

15